

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

## **REQUEST TO BE FILED EX PARTE AND UNDER SEAL**

October 31, 2024

**BY EMAIL**
The Honorable Cathy Seibel
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

      Re:    **United States v. Mout'z Soudani, a/k/a "Marty," a/k/a "Martin," a/k/a "Senior," 24 Cr. 555 (CS)**

Dear Judge Seibel:

      The Government respectfully submits this letter in advance of the bail modification hearing requested by the defendant that is scheduled for tomorrow, November 1, 2024, at 4:00 p.m. The Government submits this letter seeking the defendant's remand *ex parte* and under seal because, as set forth below, the defendant appears to have made false statements to the Court and the Government is concerned that he poses a risk of flight that would be exacerbated by the public filing of this letter. The Government requests that this letter remain *ex parte* and under seal until the parties, including the defendant, are present in court tomorrow.[1]

      By way of background, on October 25, 2024, the defendant submitted a letter requesting a modification of his bail conditions in light of his inability to secure one financially responsible person ("FRP") to secure his $1 million bond. (Dkt. 18). The defendant's proposed modification to substitute an FRP with $100,000 in cash is insufficient to reasonably assure that he will continue to appear in court for the duration of the case and that he will not tamper with witnesses. As an initial matter, at the defendant's presentment on September 24, 2024, the Government noted that the defendant posed a risk of flight because of his foreign ties, his lack of ties to the community, and his significant assets. Since the defendant's presentment, the defendant has failed to even propose one FRP to co-sign the bond, and the fact that no one is willing to serve as a co-signer further confirms that the defendant has limited ties to the community and that the limited number of individuals with whom he may be connected are not confident that the defendant will comply with the terms of his pretrial release. In addition, the Government has learned that the defendant may have perpetrated a fraud on the Court by making false statements to the Pretrial Services Office ("Pretrial") and to the Court by representing that he owns the property he used to secure his

---

[1] If the Court permits, the Government will provide a copy of this letter to defense counsel shortly before tomorrow's proceeding and after confirming the defendant's presence in the courtroom.

bond (the "Property") when he may not, in fact, own the Property. Given the Government's concerns regarding the defendant's foreign ties, his apparent lack of ties to this community, and his potential fraud on the Court, the Government requests that the Court order the defendant detained. In the alternative, the Government requests that the defendant secure his bond with an additional $378,286.42 in cash and that the defendant be placed on home detention and location monitoring enforced by GPS.

I.   **Background**

   A.   **Procedural History**

On September 24, 2024, Indictment 24 Cr. 555 (CS) was unsealed, charging the defendant with: (1) bribery conspiracy, in violation of 18 U.S.C. § 371; (2) bribery, in violation of 18 U.S.C. §§ 666(a)(2) and 2; (3) honest services wire fraud conspiracy, in violation of 18 U.S.C. § 1349; (4) honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2; and (5) interstate threats, in violation of 18 U.S.C. §§ 875 and 2. (Dkt. 1). The charges against the defendant related to his alleged scheme to bribe a state prosecutor ("CC-1") to investigate and prosecute two of the defendant's family members (referenced in the Indictment as "Individual-1" and "Individual-2"), and the interstate threats that the defendant made to Individual-1 and others. (*Id.*).[2]

Also on September 24, 2024, the defendant was arrested and presented before United States Magistrate Judge Judith C. McCarthy, who set the following bail conditions, among others: (1) a $1 million bond secured by (a) the defendant's rental property valued at $800,000, *i.e.*, the Property, (b) $100,000 in cash, and (c) cosigned by one FRP; (2) location monitoring and a curfew to be determined by Pretrial Services until the defendant posted $100,000; and (3) the defendant must refrain from contact with co-conspirators, potential witnesses, or victims of this investigation, unless in the presence of counsel, including Individual-1, Martin Soudani, the defendant's nephew (referenced in the Indictment as Individual-2 but hereinafter "Martin"), and a third individual ("Individual-3"), and any current or former employees of the Orange County District Attorney's Office. (Dkt. 6).[3]

On October 10, 2024, the defendant asked the Court for a one-week extension to meet his bail conditions (namely, to obtain one FRP); the Government did not oppose. (Dkt. 14). Over the

---

[2] In connection with the state investigation and prosecution of Individual-1 and Individual-2, in January 2024, the Orange County District Attorney's Office ("OCDA") transmitted approximately $478,286.42 obtained from Individual-1 and Individual-2 to the defendant, pursuant to a restitution order. On October 15, 2024, the Honorable Hyun Chin Kim, County Court Judge in Orange County, New York, vacated the judgment of conviction against Individual-2 and declared the restitution order null and void. (Ex. A). At this time, the Government is not aware of whether Orange County or the Rockland County District Attorney's Office will attempt to recoup the money already remitted to the defendant. (The OCDA recused itself from the state criminal prosecution of Individual-1 and Individual-2, and the Rockland County District Attorney's Office is handling the case.)

[3] The Government provided the identities of Individual-1, Individual-2, and Individual-3 to the defense and to Pretrial on or about September 25, 2024.

last two weeks, the parties have conferred with respect to the defendant's bail conditions. The defense proposed substituting $100,000 in cash for the FRP, and the Government advised that it believed the defendant's inability to identify even one FRP reflected his lack of ties to the community and risk of flight, and that $100,000 in cash would not be a sufficient substitute. On October 24, 2024, the Government requested that the defense provide copies of the exhibits attached to the defendant's Confession of Judgment to secure the Property in connection with his bond in this matter, and also asked for any other trust-related documents that show that the defendant owns the Property.

On October 25, 2024, the defendant filed a letter requesting a hearing regarding the defendant's bail conditions. (Dkt. 18). After the defendant filed the October 25, 2024 letter, the Government informed defense counsel of its additional concerns about the ownership of the Property. The Government again asked the defense for additional information about the Property. The Government proposed to the defendant that, subject to its investigation of the ownership of the Property, the defendant secure his bond with an additional $378,286.42 in cash, which would total $478,286.42 in secured cash to date, the amount of restitution declared null and void, and that the defendant be placed on location monitoring enforced by GPS with a curfew as directed by Pretrial Services. The defendant declined the Government's proposal.

### B.    The 2002 Trust and Purported 2017 Assignment to a New Trust

Since the defendant's initial presentment, the Government has learned the following about the Property.

On or about February 11, 2002, an irrevocable trust was entered into by the defendant and another individual the defendant eventually married in 2010, and the Property was included as trust estate property in the 2002 Trust. *See* Ex. B (the "2002 Trust") Schedule A ¶ 3. The 2002 Trust had a single beneficiary, Martin, who was about seventeen years old at the time the 2002 Trust was created, and he was still using his birthname, Moutaz M. Soudani. *Id.* at 2 (referring to Moutaz M. Soudani as the beneficiary). In 2007, Martin legally changed his name from Moutaz to Martin, but the name of the beneficiary on the 2002 Trust remained "Moutaz M. Soudani." The defendant was designated as the trustee on the 2002 Trust. Under Article Ten of the 2002 Trust, Martin, as the beneficiary, could not assign, transfer, encumber, or otherwise dispose of trust income or principal until the same is actually paid to or transferred to Martin by the trustee. *See id.* at 10 ("No beneficiary shall have any right, power or authority to assign, transfer, encumber or otherwise dispose of such income or principal or any part thereof until the same shall be paid to such beneficiary by the Trustee."). Therefore, Martin had no authority to assign or grant the 2002 Trust assets to another trust.

In or about September 2017, there were two documents that were purportedly executed in connection with the 2002 Trust. First, there was an assignment by which the 2002 Trust's beneficiary, Martin, purportedly assigned the "beneficial interest" in the trust to the defendant as trustee of a new trust titled the "Mout'z F. Soudani Grantor Trust." *See* Ex. C (the "2017 Assignment"). Although the 2017 Assignment bears Martin's signature, the Government understands from Martin's counsel that Martin does not recall signing this document, he does not believe that he signed it, and he does not know why he would have signed it. On page two of the 2017 Assignment, there is no notary stamp for the signature represented to be Moutaz M. Soudani,

3

*i.e.*, Martin. Rather, there is only a notary stamp for the signature of Mout'z F. Soudani, the defendant. The notary's signature associated with notarizing Martin's signature on page two actually stops midway through the signature. Ex. C at 2. The FBI interviewed the notary who notarized the defendant's signature ("Notary-1"), who recalled that there was only one person who came to the law firm where Notary-1 was then working to have the 2017 Assignment notarized, and Notary-1 would have only notarized a signature if the signor were present. Therefore, the 2017 Assignment purports to bear Martin's signature, but the signature is not notarized. In any event, as detailed above, the 2002 Trust appeared to deny the beneficiary, Martin, the power to assign or transfer assets that he had not yet received. Ex. B at 10 at 10. Therefore, Martin had no authority to assign or grant the 2002 Trust assets to another trust.

The second document, dated September 21, 2017, purported to be a trust document creating the Mout'z F. Soudani Grantor Trust. *See* Ex. D (the "2017 Trust"). Under the 2017 Trust, the defendant would be both the trustee and beneficiary, and Martin would not be a beneficiary. Instead, Martin was the purported grantor of the 2017 Trust, and under the 2017 Trust, Martin granted all property in the 2002 Trust into the new 2017 Trust, as well as all property from the 2002 Trust, including the Property. A different notary ("Notary-2") notarized what purports to be Martin's signature. *See id.* at 12. Notably, Notary-2's notarization was made on September 22, 2017, the day after Notary-1's partial notarization on September 21, 2017, referenced above. The FBI interviewed Notary-2, who notarized Martin's signature, and recalled that there was only one person who came to the bank where Notary-2 worked, and that the individual was someone who Notary-2 knew to be Mout'z Soudani, the defendant. Notary-2 explained that the defendant was a frequent customer at the bank where Notary-2 worked. When the FBI asked whether Notary-2 had ever met anyone from Mout'z Soudani's family other than Mout'z Soudani, Notary-2 confirmed that the only person from the defendant's family Notary-2 had ever met was Mout'z Soudani.[4]

The Government understands that Martin does not recall signing the 2017 Trust, believes he would have remembered signing it if he had, and has no recollection of going to a law firm to sign such a document. In fact, based on documents obtained from Walden Savings Bank, the Government is aware that the person who signed the 2017 Trust as Martin (*i.e.*, the defendant) provided Notary-2 with an expired driver's license for Moutaz M. Soudani (*i.e.*, Martin). However, Martin had a *valid* driver's license in 2017, so it is unlikely that he would have used an *expired* driver's license to notarize the 2017 Trust. *See* Ex. E (Martin's driver's license showing it was issued in August 2016 and that it expired August 2022). Additionally, the defendant's signature on the 2017 Trust is notarized by Notary-1 on September 21, while Martin's signature is notarized by Notary-2 on September 22. If Martin had really been with the defendant on September 21 to sign the 2017 Assignment—as the 2017 Assignment purports—it would stand to reason that Martin would have simply had the 2017 Assignment notarized at that time.

In or about October 2020, a Walden Savings bank account was opened in the name of the 2002 Trust by its trustee, the defendant. *See* Ex. F (the "2020 Bank Affidavit"). The documents

---

[4] When interviewed by the FBI, Notary-2 was not sure how she notarized the 2017 Trust for the defendant based on an expired driver's license for Martin. Among other plausible explanations, it is possible that given how closely the names Mout'z F. Soudani (the defendant) and Moutaz M. Soudani (Martin) resemble each other, Notary-2 mistakenly determined that the expired driver's license in fact belonged to the defendant.

submitted for that account were only the 2002 Trust, *i.e.*, neither the 2017 Assignment nor the 2017 Trust were submitted. The account opening document swore that the 2002 Trust was valid, and had not been amended. These assertions would be false, or at least misleading, if the 2017 Assignment and 2017 Trust were valid documents.

In connection with this criminal case, on September 24, 2024, the defendant reported to Pretrial that he owned the Property. The defendant agreed to secure his $1 million bond with the Property, which he submitted was valued at approximately $800,000. (*See* Dkt. 6). On October 10, 2024, in connection with this case, the defendant signed a sworn affidavit stating that "I as Trustee own and control [the Property] out right without a mortgage and lien." *See* Ex. G.[5]

The information above suggests, certainly by a preponderance of the evidence, that in 2017, the defendant forged Martin's signature and/or impersonated him before Notary-2 so that the defendant would regain control over the assets he had previously placed into trust for his nephew.[6]

### C. September 25, 2024 Text Message

Separate from the issues concerning the Property, on or about September 25, 2024, approximately the day after the defendant's arrest and subsequent release subject to the above bail conditions, an individual who resides with the defendant (the "Texter") sent a text message to the individual referenced in the Indictment as Individual-1. The text message to Individual-1 referenced CC-2 and read: "[CC-2's] blood is on your hands. Just leave us alone." Given the defendant's repeated threats against Individual-1 and others, as detailed in the Indictment, including by sending communications to Individual-1 through others, inclusion of "us" rather than "me," and the defendant's bail conditions, the above text message is concerning. That said, defense counsel represented to the Government—as did the Texter to the FBI—that the defendant did not direct the Texter to send the text message to Individual-1. To the extent that the defendant does seek to communicate with any potential witnesses, the Government will promptly advise the Court and may seek amended conditions or remand.

---

[5] In connection with the defendant's now-deceased co-conspirator's ("CC-2") investigation and prosecution of Individual-2, on or about May 12, 2023, the defendant testified under oath in the state grand jury that the 2017 Trust replaced the 2002 Trust, and that Martin does not have an interest in the 2017 Trust.

[6] The Government notes that in or about August 2016, the defendant was arrested for, among other things, possession of a forged instrument and offering a false instrument for filing in connection with his alleged forgery of a deceased notary's signature. The Government understands that the charges against the defendant were ultimately dismissed.

**II.     Discussion**

The Government is extremely troubled by the information presently before the Court, which establishes that the defendant poses a risk of flight and a risk of tampering with potential witnesses. As an initial matter, the defendant's criminal conduct—including the bribery scheme he used to harm his own family members, his use of the law for his own, vindictive purposes, and his repeated threats and boasts touting his powerful connections to subjects of the state criminal case he had requested—establishes the defendant's utter disregard for the law. Indeed, the defendant's crimes are a product of his apparent view that he is above the law and able to act with impunity. The evidence against the defendant, as detailed in the 43-page Indictment, is overwhelming, and indicates a strong likelihood that the defendant will be convicted following trial. The defendant faces a maximum sentence of 60 years' imprisonment, and he has every reason to flee from justice.

The defendant also has the means and resources to flee. He has significant family ties to Jordan and has reported approximately $1.6 million in his bank accounts. He has historically held significant sums of money in cash, including because of the cash business that he operated, and apparently had no difficulties paying CC-2 at least $63,000 during the course of the scheme. Meanwhile, despite the length of time he has lived in the community, the defendant cannot identify a single person as a possible co-signer to secure his bond, and the Government understands that he is estranged from his son and other family members. Simply providing additional cash to the Clerk's Office—when the defendant has access to exponentially more cash—is insufficient to assure his presence before the Court.

Further, as detailed above, there are serious concerns about whether the defendant owns the Property that the defendant used to secure his bond—or if he has committed forgery, identity theft, fraud, and perjury. The evidence indicates that the defendant fraudulently transferred Martin's interest in the 2002 Trust to the defendant, which means that the defendant does not own the Property, cannot use the Property to secure his bond, and has knowingly perpetrated a fraud on this Court. Therefore, in order to reasonably assure the defendant's appearance in this case, the Court should order the defendant detained. The defendant pledging real property that he does not own does not any provide "moral suasion" against his flight. *See United States v. Zhang*, No. 22-CR-208-4 (CBA), 2022 WL 17420740, at *4 (E.D.N.Y. Aug. 3, 2022) ("Giving up investment property with unclear ownership that may already be in some jeopardy may seem like a small price to avoid life imprisonment") (citing *United States v. Martinez*, 151 F.3d 68, 71 (2d Cir. 1998) (discussing bond package in terms of its "ability to exercise moral suasion" over the defendant "should he decide to flee"), *aff'd*, 55 F.4th 141 (2d Cir. 2022)).

In the alternative, the Court should order the defendant detained until he posts an additional $378,286.42, and should order that the defendant be placed on home detention with location monitoring enforced by GPS.

                    Respectfully submitted,

                    DAMIAN WILLIAMS
                    United States Attorney

By:  /s/
      Jane Kim /Catherine Ghosh /Jared Hoffman
      Assistant United States Attorneys
      (212) 637-2038 / -1114 / (914) 993-1928