UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br> v.<br><br>MOUT'Z SOUDANI,<br>    a/k/a "Marty,"<br>    a/k/a "Martin,"<br>    a/k/a "Senior,"<br><br><div align="center">Defendant.</div> | **S1 24 Cr. 555 (CS)** |

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York

Jared D. Hoffman
Justin Horton
Olga I. Zverovich
Assistant United States Attorneys
    *- Of Counsel -*

## TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................................................ 1

ARGUMENT ............................................................................................................................... 6

I.  The Court Should Preclude Improper Argument And Evidence About The Merits of The
    Paid-For Prosecution ......................................................................................................... 6

    A.  Background ................................................................................................................... 6

    B.  Discussion .................................................................................................................... 7

II.  Limited Testimony Regarding Soudani's History of Threats And Abuse is Admissible as
     Direct Evidence of the Charged Offenses And Pursuant to Rule 404(b) ........................... 10

    A.  Background ................................................................................................................... 10

    B.  Applicable Law ............................................................................................................. 11

    C.  Discussion .................................................................................................................... 13

III. A Partial Recording Of Rosenwasser's Planned Confrontation of Individual-1 at Her
     Arrest in Colorado Is Admissible ..................................................................................... 17

    A.  Background ................................................................................................................... 18

    B.  Applicable Law ............................................................................................................. 20

        1.  Hearsay ................................................................................................................. 20

        2.  Co-Conspirator Statements ................................................................................... 21

        3.  Excited Utterances ............................................................................................... 21

        4.  Transcripts as Jury Aids ...................................................................................... 23

    C.  Discussion .................................................................................................................... 23

IV. Rosenwasser's Communications with Individual-1's Counsel are Admissible as Co-
    Conspirator Statements And to Show the Effect on The Listener ...................................... 27

    A.  Background ................................................................................................................... 27

        1.  Rosenwasser's Communications with Individual-1's Counsel in Furtherance of
            Soudani's Conspiracy ......................................................................................... 27

        2.  Rosenwasser's Lies to OCDA to Conceal and Maintain the Conspiracy ............... 30

    B.  Discussion .................................................................................................................... 31

V.  Evidence of Prior Bribery Schemes Is Admissible Pursuant to Rule 404(b) ....................... 33

    A.  Background ................................................................................................................... 33

        1.  Anticipated Testimony of Witness-1 ...................................................................... 33

        2.  Anticipated Testimony of Individual-1 .................................................................. 34

        3.  Anticipated Testimony of Witness-2 ...................................................................... 36

B. Applicable Law ................................................................................................... 38

C. Discussion............................................................................................................. 40

    1.    The Testimony of Witness-1 and Individual-1  Is Admissible for Proper Purposes and Relevant to Disputed Issues............................................................... 40

    2.    Witness-2's Testimony Is Admissible for Proper Purposes and Is Relevant to Disputed Issues................................................................................................ 42

    3.    The Proposed Evidence Is Admissible Under Rule 403 ....................................... 44

VI. In the Alternative, Witness-1's Testimony that Soudani Told Witness-1 About Rosenwasser's Past Bribetaking Is Admissible To Show Soudani's State of Mind ............. 45

VII. Evidence of Rosenwasser's Lies to the FBI is Admissible .................................................. 46

CONCLUSION................................................................................................................. 48

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bourjaily v. United States*,
  483 U.S. 171 (1987) ................................................................................................ 21

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
  499 U.S. 365 (1991) .................................................................................................. 7

*Crawford v. Washington*,
  541 U.S. 36 (2004) ................................................................................................. 47

*Elonis v. United States*,
  575 U.S. 723 (2015) ............................................................................................... 13

*George v. Celotex Corp.*,
  914 F.2d 26 (2d Cir. 1990) ..................................................................................... 20

*Huddleston v. United States*,
  485 U.S. 681 (1988) ............................................................................................... 38

*United States v. Abreu*,
  No. 22-2676, 2023 WL 8270427 (2d Cir. Nov. 30, 2023) ..................................... 16

*United States v. Alfisi*,
  308 F.3d 144 (2d Cir. 2002) ..................................................................................... 8

*United States v. Basciano*,
  465 F. App'x 9 (2d Cir. 2012) ............................................................................... 41

*United States v. Bouterse*,
  765 F. App'x 463 (2d Cir. 2019) ..................................................................... 25, 32

*United States v. Cadet*,
  664 F.3d 27 (2d Cir. 2011) ..................................................................................... 16

*United States v. Calk*,
  87 F.4th 164 (2d Cir. 2023) ..................................................................................... 8

*United States v. Caputo*,
  808 F.2d 963 (2d Cir. 1987) ................................................................................... 42

*United States v. Colon*,
  880 F.2d 650 (2d Cir. 1989) ................................................................................... 39

*United States v. Coyne*,
  4 F.3d 100 (2d Cir. 1993) ........................................................................................ 8

*United States v. Curescu*,
    674 F.3d 735 (7th Cir. 2012) ........................................................................................................... 42

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011) ............................................................................................................... 12

*United States v. Davis, No. 24 Cr. 192*
    (WFK), 2025 WL 1201983 (E.D.N.Y. Apr. 25, 2025) .................................................................... 22

*United States v. Delva, No. 12 Cr. 802*,
    2014 WL 4460360 (S.D.N.Y. Sept. 10, 2014) ................................................................................. 25

*United States v. Delvi*,
    275 F. Supp. 2d 412 (S.D.N.Y. 2003) ....................................................................................... 22, 24

*United States v. Downing*,
    297 F.3d 52 (2d Cir. 2002) ............................................................................................................... 42

*United States v. Dupree*,
    706 F.3d 131 (2d Cir. 2013) ....................................................................................................... 21, 39

*United States v.Dupree*,
    870 F.3d (2d Cir. 2017) ............................................................................................................. 42, 43

*United States v. Eisen*,
    974 F.2d 246 (2d Cir. 1992) ............................................................................................................. 32

*United States v. Everett*,
    825 F.2d 658 (2d Cir. 1987) ....................................................................................................... 38, 43

*United States v. Fazal-Ur-RahIndividual-1-Fazal*,
    355 F.3d 40 (1st Cir. 2004) .............................................................................................................. 15

*United States v. Fell*,
    531 F.3d 197 (2d Cir. 2008) ....................................................................................................... 22, 24

*United States v. Fernandez*,
    839 F.2d 639 (9th Cir. 1987) ........................................................................................................... 34

*United States v. Fishman*,
    157 F.4th 143 (2d Cir. 2025) ........................................................................................................... 13

*United States v. Francis*,
    164 F.3d 120 (2d Cir. 1999) ....................................................................................................... 13, 14

*United States v. Frank*,
    11 F. Supp. 2d 314 (S.D.N.Y. 1998) ............................................................................................... 15

*United States v. Fratus*,
    No. 22-1185, 2023 WL 2710270 (3d Cir. Mar. 30, 2023) .............................................................. 13

*United States v. Gata-Aura*,
   No. 22-283, 2024 WL 389422 (2d Cir. Feb. 2, 2024) .......................................................... 42

*United States v. Gatto*,
   986 F.3d 104 (2d Cir. 2021) ...................................................................................... 8

*United States v. George*,
   779 F.3d 113 (2d Cir. 2015) .................................................................................... 47

*United States v. Gigante*,
   166 F.3d 75 (2d Cir. 1999) ...................................................................................... 21

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) .................................................................................... 12

*United States v. Gordon*,
   987 F.2d 902 (2d Cir. 1993) .................................................................................... 38

*United States v. Guang*,
   511 F.3d 110 (2d Cir. 2007) .................................................................................... 38

*United States v. Gupta*,
   747 F.3d 111 (2d Cir. 2014) .............................................................................. 21, 25

*United States v. Holmes*,
   421 F. App'x 76 (2d Cir. 2011) ............................................................................... 17

*United States v. Howard*,
   692 F.3d 697 (7th Cir. 2012) ................................................................................... 15

*United States v. Johnson*,
   860 F.3d 1133 (8th Cir. 2017) ................................................................................. 15

*United States v. Jones*,
   299 F.3d 103 (2d Cir. 2002) .......................................................................... 22, 23, 24

*United States v. Lyle*,
   919 F.3d 716 (2d Cir. 2019) .............................................................................. 44, 46

*United States v. Manton*,
   107 F.2d 834 (2d Cir. 1939) ...................................................................................... 8

*United States v. Marin*,
   669 F.2d 73 (2d Cir. 1982) ...................................................................................... 34

*United States v. Martino*,
   759 F.2d 998 (2d Cir. 1985) .................................................................................... 45

*United States v. McCain*,
   No. 21-2982, 2023 WL 2335332 (2d Cir. Mar. 3, 2023) .................................................. 13

*United States v. McCallum*,
   584 F.3d 471 (2d Cir. 2009) .................................................................................................. 39

*United States v. Mercado*,
   573 F.3d 138 (2d Cir. 2009) .................................................................................................. 39

*United States v. Moskowitz*,
   581 F.2d 14 (2d Cir. 1978) .................................................................................................... 24

*United States v. Munoz-Mosquera*,
   101 F.3d 683, 1996 WL 281591 ...................................................................................... 20, 24

*United States v. Mustafa*,
   753 F. App'x 22 (2d Cir. 2018) ............................................................................................. 43

*United States v. Napout, No. 15-CR-252*
   (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .......................................................... 9

*United States v. Neumann, No. 21 Cr. 439*
   (NSR), 2023 WL 8700974 (S.D.N.Y. Dec. 14, 2023) ......................................................... 47

*United States v. Padilla*,
   203 F.3d 156 (2d Cir. 2000) .................................................................................................. 21

*United States v. Pascarella*,
   84 F.3d 61 (2d Cir. 1996) ...................................................................................................... 41

*United States v. Paulino*,
   445 F.3d 211 (2d Cir. 2006) ...................................................................................... 17, 25, 44

*United States v. Pitre*,
   960 F.2d 1112 (2d Cir. 1992) .................................................................................... 17, 39, 45

*United States v. Porter*,
   881 F.2d 878 & n.8 (10th Cir. 1989) ..................................................................................... 44

*United States v. Rivera*,
   22 F.3d 430 (2d Cir. 1994) .................................................................................................... 21

*United States v. Roldan-Zapata*,
   916 F.2d 795 (2d Cir. 1990) ............................................................................ 16, 32, 39, 40, 41, 44

*United States v. Romero-Padilla*,
   583 F.3d 126 (2d Cir. 2009) .................................................................................................. 38

*United States v. Rosa*,
   17 F.3d 1531 (2d Cir. 1994) .................................................................................................. 23

*United States v. Rosemond*,
   958 F.3d 111 (2d Cir. 2020) ........................................................................... 38, 39, 41, 44

*United States v. Rosen*,
 716 F.3d 691 (2d Cir. 2013) ......................................................................... 8

*United States v. Salameh*,
 152 F.3d 88 (2d Cir. 1998) ......................................................................... 32

*United States v. Scarpa*,
 913 F.2d 993 (2d Cir. 1990) .................................................................. 22, 23

*United States v. Segui, No. 19 Cr. 188*
 (KAM), 2019 WL 8587291 (E.D.N.Y. Dec. 2, 2019) ................................... 13, 14

*United States v. Silver*,
 948 F.3d 538 (2d Cir. 2020) ......................................................................... 8

*United States v. Snype*,
 441 F.3d 119 (2d Cir. 2006) ........................................................................ 16

*United States v. Spencer*,
 2023 WL 5091827 (2d Cir. Aug. 9, 2023) ..................................................... 22

*United States v. Stewart*,
 433 F.3d 273 (2d Cir. 2006) ........................................................................ 47

*United States v. Tarantino*,
 846 F.2d 1384 (D.C. Cir. 1988) .................................................................... 21

*United States v. Tocco*,
 135 F.3d 116 (2d Cir. 1998) .................................................................. 22, 24

*United States v. Torres*,
 No. 21-2665, 2023 WL 378942 (2d Cir. Jan. 25, 2023) .................................. 44

*United States v. Wells Fargo Bank N.A., No. 12 Civ. 7527*
 (JMF), 2015 WL 3999074 (S.D.N.Y. June 30, 2015) ...................................... 6

*United States v. Williams*,
 205 F.3d 23 (2d Cir. 2000) .................................................................. 43, 46

*United States v. Williams*,
 577 F.2d 188 (2d Cir. 1978) ........................................................................ 38

*United States v. Williams*,
 585 F.3d 703 (2d Cir. 2009) ........................................................................ 12

*United States v. Williams*,
 731 F. App'x 894 (11th Cir. 2018) ................................................................ 14

*United States v. Williams*,
 930 F.3d 44 (2d Cir. 2019) .......................................................................... 13

*United States v. Willis*,
844 F.3d 155 (3d Cir. 2016) .................................................................................................... 42

*United States v. Williston*,
862 F.3d 1023 (10th Cir. 2017) ............................................................................................... 14

*United States v. Zackson*,
12 F.3d 1178 (2d Cir. 1993) .............................................................................................. 39, 45

*United States v. Zemlyansky*,
908 F.3d 1 (2d Cir. 2018) .................................................................................................. 23, 26

## Rules

Fed. R. Evid. 104 ................................................................................................................... 21
Fed. R. Evid. 402 ................................................................................................................... 12
Fed. R. Evid. 403 ........................................................................... 9, 12, 15, 27, 33, 41, 45, 47
Fed. R. Evid. 802 ................................................................................................................... 20
Fed. R. Evid. 803 ......................................................................................................... 22, 23, 24
Fed R. Evid. 801 ............................................................................... 16, 18, 20-21, 24, 48
Fed R. Evid. 404 ........................................................................................................... passim
Fed R. Evid. 401 ........................................................................................................ 9, 12, 45

## Statutes

18 U.S.C. § 875 ...................................................................................................................... 13

The Government respectfully submits these motions *in limine* in advance of the trial of defendant Mout'z Soudani, scheduled to begin on June 10, 2026.  For the reasons that follow, the Government moves *in limine* for orders: (1) precluding improper argument and evidence about the merits of the state criminal prosecution that Soudani bribed Stewart Rosenwasser to bring; (2) admitting limited testimony about Soudani's history of threats and abuse toward one of the subjects of the state criminal prosecution as direct evidence and pursuant to Federal Rule of Evidence 404(b); (3) admitting an excerpted video recording of Stewart Rosenwasser's confrontation of that subject as part of the state criminal prosecution; (4) admitting Rosenwasser's communications with that subject's lawyer during the state criminal prosecution; (5) admitting evidence of prior similar bribery conduct by Soudani and Rosenwasser pursuant to Rule 404(b); and (6) admitting, in the alternative, Soudani's statement to a testifying witness about Rosenwasser's previous bribetaking as evidence of Soudani's state of mind; and (7) admitting evidence that Rosenwasser lied in a voluntary interview with law enforcement.

## FACTUAL BACKGROUND

On December 3, 2025, a grand jury in this District returned a superseding indictment charging Soudani in six counts.  Counts One through Four charge bribery, honest services fraud, and conspiracies to commit the same (the "Bribery Counts").  The Bribery Counts arise out of Soudani's corrupt agreement with Stewart Rosenwasser, a former senior prosecutor in the Orange County District Attorney's Office ("OCDA"), that Soudani would pay Rosenwasser money disguised as loans in exchange for Rosenwasser prosecuting Soudani's estranged sister and nephew ("Individual-1," "Individual-2," and the "Paid-For Prosecution").  Count Five charges an interstate threat in connection with Soudani's sending a text message threatening to physically harm Individual-1 (the "Threats Count").  Count Six (the "Obstruction Count") charges destruction

of records and concerns Soudani's deletion of incriminating text messages with Rosenwasser weeks after the Federal Bureau of Investigation (the "FBI") searched Soudani's home and just minutes after Soudani found out that the Government intended to seize his cellphone with a warrant.

At trial, and subject to the Court's rulings, the Government expects to prove the following, in substance and in part:[1] Soudani has lived in Orange County for decades, where he formerly owned restaurants frequented by local powerbrokers and has held various real estate interests. In 1977, Soudani's then-teenage sister, Individual-1, moved from Jordan to live with Soudani and his family in New York. For most of the next five decades, Individual-1 lived in Soudani's residence (the "Soudani Home"), joined later by her son and Soudani's nephew, Individual-2.

Individual-1 and Soudani knew Rosenwasser since at least the early 1990s, when—as a lawyer then in private practice—Rosenwasser represented Soudani and his son ("Individual-3") in certain legal matters. Rosenwasser also socialized with Soudani and Individual-1, both at Soudani's restaurant and at the Soudani Home. From approximately 2000 to 2006, Rosenwasser served as a judge in the Orange County Court. During this time, Rosenwasser continued to interact with Soudani and Individual-1, including by visiting them at their shared home.

After stepping down from the bench in 2006, Rosenwasser reentered private practice in Orange County and served as a referee for state commissions on judicial and attorney conduct. In 2019, Orange County District Attorney David Hoovler appointed Rosenwasser as an Executive Assistant District Attorney. In that role, Rosenwasser, among other things, reviewed and approved indictments and provided advice to the District Attorney and other OCDA prosecutors.

---

[1] This factual recitation is intended to present facts relevant to the motions *in limine* and is not a comprehensive set of facts that the Government intends to prove at trial.

In October 2022, Individual-1 and Individual-2 (who is Individual-1's son, and Soudani's nephew, who had more recently come to live at the Soudani Home), left suddenly from the Soudani Home and moved into an apartment in Colorado owned by Individual-3 (Soudani's son, whose own home was nearby).  That same month, days after Individual-1 and Individual-2 left Soudani's home, Soudani told a friend and former federal law enforcement officer ("Witness-1") that his sister and nephew had stolen money from Soudani that he intended to get back.  Soudani told Witness-1 that Rosenwasser—at that time, a senior OCDA prosecutor—already owed Soudani about $40,000 in outstanding unpaid loans, and that Rosenwasser would "take care of [Soudani's] situation"—*i.e.*, use his authority as a senior prosecutor to see to it that Individual-1 and Individual-2 are prosecuted as Soudani wished.

That same month, in late October 2022, an OCDA criminal investigation into Individual-1 and Individual-2—the Paid-For Prosecution—was opened at Rosenwasser's request.  The investigation involved allegations that Individual-1 and Individual-2 stole money from Soudani.  Less than two weeks later, on November 10, 2022, Soudani wrote Rosenwasser a check for $15,000.  After that initial bribe payment, Rosenwasser promised Soudani in a text message that he would put "maximum effort" into the matter.  The next month, Soudani texted Rosenwasser: "I give you my word at the end you will be extremely more than happy."

Soudani and Rosenwasser communicated regularly throughout the Paid-For Prosecution, including through text messages, phone calls, and in-person meetings.  Soudani frequently demanded updates on the investigation, referring in one text message to "my expectations" for Rosenwasser.  Rosenwasser, in turn, provided Soudani with information about the investigation's progress.  These updates included sensitive and confidential details that were inappropriate for a prosecutor to share with a complainant, like the address of the apartment to which Individual-1

3

and Individual-2 relocated in Colorado. In early 2023, as he was preparing to charge Individual-1 and Individual-2 by felony complaint, Rosenwasser shared with Soudani his idea to appear personally at the scene of their arrests in Colorado. Soudani wrote back that Rosenwasser's plan was "the most genius thing."

As the Paid-For Prosecution progressed, Soudani sent furious messages to Individual-1 and Individual-2, routing the communications through his son (Individual-3, who lived near Individual-1 and Individual-2 in Colorado) and the lawyer whom Individual-1 retained to represent her in connection with the Paid-For Prosecution ("Individual-1's Counsel"). In April 2023, Soudani sent a text message to his son, Individual-3, to be shared with his then-estranged sister, Individual-1 (the "Interstate Threat"). Among other things, the Interstate Threat said, "swear to God I wanna fucking choke you with my own hands you deserve a fucking beating like you never had before." This message from Soudani to his estranged sister ended with: "Motherfucker, I swear to you I'm a going to get you and him [*i.e.*, Individual-2] one way, or another as it's a promise come clean your bitch you have to[.]" Less than one month later, Rosenwasser obtained a grand jury indictment charging Individual-2 with state crimes. As he did throughout the course of the Paid-For Prosecution, Soudani paid for this progress in the prosecution. On the days before both of Rosenwasser's two grand jury presentations in connection with the indictment, Soudani gave Rosenwasser money orders totaling approximately $10,000.

Around this same time in the spring of 2023, Individual-1's Counsel corresponded with Rosenwasser and OCDA about conflicts of interest under which Rosenwasser was laboring and that, at the time, were apparent to Individual-1 and her lawyer. The complaints concerned Rosenwasser's representations of Soudani (the ostensible victim of the crimes under investigation) and his son in the early 1990s, and his social relationship with Soudani and Individual-1 (one of

4

the targets of the investigation).  In meetings with OCDA colleagues about his potential recusal, Rosenwasser lied about the extent of his relationship with Soudani and Individual-1. He never disclosed his prior debt to Soudani or the tens of thousands of dollars he had been taking from Soudani after initiating the Paid-For Prosecution at his request.

Ultimately, OCDA required  Rosenwasser to recuse himself from the Paid-For Prosecution before its completion.  OCDA's case against Individual-1 was dismissed, including because there was insufficient evidence against Individual-1.  In November 2023, Individual-2 pleaded guilty to a larceny charge.[2]  On January 5, 2024, OCDA paid Soudani restitution, by check, in the amount of $478,286.42.  Three days later, Soudani cut Rosenwasser a bribe check for $15,000.  In total, Rosenwasser accepted at least approximately $63,000 in bribe payments from Soudani for the Paid-For Prosecution.

Later that year, in the summer of 2024, both Rosenwasser and Soudani gave voluntary interviews to the FBI in connection with searches of their residences pursuant to warrants. Soudani's admissions in these interviews included that he had paid Rosenwasser (transactions he insisted were loans), and that Soudani had told Rosenwasser to indict Individual-1 to "humble" her and stop her false claims that Soudani had raped her.  Soudani also attempted to minimize the seriousness of his conduct by suggesting the benefits he bestowed upon Rosenwasser could not be a bribe because Rosenwasser's investigation and prosecution were meritorious. For example, Soudani told the agents that he had asked a friend if paying Rosenwasser after the initiation of the Paid-For Prosecution "would appear as a bribe," and that the friend told Soudani, "How can you

---

[2] Individual-2's conviction was eventually vacated based on Rosenwasser's failure to disclose the payments he had received from Soudani in connection with the Paid-For Prosecution.

bribe someone already on your side?"[3]  In his own interview, Rosenwasser lied to the FBI.  Among other lies, Rosenwasser told agents that senior OCDA officials knew of his prior relationship with Individual-1 and thought it should be leveraged to benefit the Paid-For Prosecution.

## **ARGUMENT**

### I.      **The Court Should Preclude Improper Argument And Evidence About The Merits of The Paid-For Prosecution**

Soudani has suggested in pretrial court proceedings and filings that the purported merits of the Paid-For Prosecution undermine his culpability for bribery.  But the law is clear that neither the worthiness nor inevitability of an official act rebuts the charge that it was bought.  The Court should preclude Soudani from arguing that the jury should consider the merits of the Paid-For Prosecution as a defense to the Bribery Counts and from introducing evidence offered solely in support of this improper defense.  Such evidence is irrelevant to the questions for the jury at trial, and any conceivable probative value of such evidence is substantially outweighed by the risk of juror confusion, distraction from the evidence, unnecessary lengthening of the trial, and unfair prejudice to the Government.

#### A.  Background

In a November 2024 bail hearing in this case, Soudani's then-counsel suggested that the

---

[3] This friend is also a lawyer.  Soudani's statements to the FBI did not describe the friend as *Soudani's* lawyer, and Soudani's disclosure of this discussion with the friend underscores that Soudani did not consider the communications to be confidential.  In written and oral communications on February 6, 2026, Soudani, through counsel, disclaimed any intention to offer any defense of reliance on the advice or presence of counsel.  Accordingly, the Government is not moving *in limine* for notice and discovery relating to any such defense.  But the Government reserves its right to move to preclude any such defense if it is later offered without timely or adequate notice and discovery.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12 Civ. 7527 (JMF), 2015 WL 3999074, at *1 (S.D.N.Y. June 30, 2015) (defendant asserting advice of counsel defense must "make a full disclosure during discovery and the failure to do so constitutes a waiver of that defense").

purported validity of the charges that Soudani paid Rosenwasser to bring against Individual-1 and Individual-2 were "kind of lost [in] all this," arguing that Individual-1 "pled guilty because the evidence [in the Paid-For Prosecution] was overwhelming." Nov. 1, 2024 Tr. 31:8-10. Soudani's then-counsel then described a litany of evidence supposedly justifying the Paid-For Prosecution. *See id.* 31:12-20 (asserting that Individual-2 "created phon[y] accounts online, phony statements from this company . . . [h]e created a phony website and he would send it to [Soudani] and say, see, look at how your investment is doing . . ."). The Court noted that however "interesting" this view of the underlying matter was, "it's not really relevant to whether [Soudani] bribed the DA or the other charges." *Id.* 31:23-25.

Soudani's motion to dismiss the original indictment (Dkt. 41) sounded similar themes. It described Soudani as "the victim of the crime" in the Paid-For Prosecution, and again suggested the relevance to the Bribery Counts of the fact that Individual-2 "ultimately pleaded guilty" and was ordered to pay Soudani nearly half a million dollars in restitution. (Dkt. 41 at 1).

### B. Discussion

Soudani's pretrial statements augur a defense that he is not guilty of the Bribery Counts because the Paid-For Prosecution was meritorious and was a case that Rosenwasser would have brought even without Soudani's payments. The defenses of validity (the paid-for official act was worthy) and inevitability (because it was worthy, the public official would have undertaken the act anyway) are "frequently . . . asserted to a criminal bribery charge" because they are "often plausible in fact"—but they are "never valid in law." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991).[4]

---

[4] Unless otherwise noted, case and record text quotations omit internal quotation marks, citations, and prior alterations.

7

Second Circuit precedent rejecting this species of bribery defense dates back to the case of a Circuit Judge whose excuse for taking payments from litigants was that the opinions he wrote in their favor were "legally sound." *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939). That "fact is immaterial," because "the unlawfulness of the [bribery] conspiracy . . . is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it. [Official] action, whether just or unjust, right or wrong, is not for sale . . . ." *Id.* Indeed, the payors and takers of bribes may benefit from the apparent validity of a purchased official act, because it makes "discovery and exposure less probable." *Id.*

Following *Manton*, the Second Circuit has rejected defenses "that an official would have taken certain actions regardless of any alleged bribe," *United States v. Silver*, 948 F.3d 538, 562 n.14 (2d Cir. 2020), that the official's paid-for acts "also benefit constituents other than the defendant," *United States v. Rosen*, 716 F.3d 691, 701-02 (2d Cir. 2013), or that the defendant "paid money to [a public official] solely to induce him to perform his job faithfully," *United States v. Alfisi*, 308 F.3d 144, 150-52 (2d Cir. 2002).[5]

Against this backdrop, this Court responded to Soudani's then-counsel's references to the purported merits of the Paid-For Prosecution at the November 2024 bail hearing by noting that the Bribery Counts "involve[] manipulating the criminal justice system"—a charge as to which it does

---

[5] Relatedly, a defendant can commit bribery even if he had both proper and improper motives; a dual intent is not a defense. *See, e.g.*, *United States v. Calk*, 87 F.4th 164, 181 (2d Cir. 2023) ("In the context of public official bribery, we have stressed that a valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability."); *United States v. Gatto*, 986 F.3d 104, 129 n.12 (2d Cir. 2021) ("We are also unpersuaded by Defendants' dual intent argument, as it is commonplace for individuals to have more than one motive for acting."); *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (a valid purpose that partially motivates a transaction that is corrupt in part "does not insulate participants in an unlawful transaction from criminal liability").

not "matter[] whether [Soudani] really [has] been ripped off or not." Nov. 1, 2024 Tr. 33:14-19.

To ensure that Soudani does not suggest otherwise to the jury, the Court should issue a pretrial order precluding improper argument that the validity, inevitability, or public interest in the Paid-For Prosecution is a defense to the Bribery Counts. The Court should also preclude Soudani, under Federal Rules of Evidence 401 and 403, from offering evidence of the validity, inevitability, or public interest in the Paid-For Prosecution solely in support of this legally improper defense. *See United States v. Napout*, No. 15 Cr. 252 (PKC), 2017 WL 6375729, at *9 (E.D.N.Y. Dec. 12, 2017) ("Whether a fact is 'of consequence' [under Rule 401] is framed by the elements of, and *cognizable* defenses to the underlying charges." (emphasis added)). For example, Soudani should be precluded from offering Individual-2's statements during his guilty plea allocution, [6] investigative materials and evidence developed in the Paid-For Prosecution, and press releases issued by OCDA in connection with the prosecution, as well as cross-examining OCDA witnesses regarding the merits of the Paid-For Prosecution, if such evidence is offered solely in support of the legally improper defense that the purported merits of the Paid-For Prosecution undermine Soudani's culpability for bribery. Such evidence is irrelevant if offered solely for this improper purpose and, moreover, any probative value is substantially outweighed by the risk of unfair prejudice, misleading the jury, and wasting time by creating a mini-trial that would be both significantly distracting and confusing to the jury. Fed. R. Evid. 403.[7]

---

[6] To the extent the fact of Individual-2's guilty plea is admitted in evidence, the jury should be informed that Individual-2's conviction was ultimately vacated based on Rosenwasser's failure to disclose the payments he had received from Soudani in connection with the Paid-For Prosecution.

[7] The Government is not at this time seeking to preclude any evidence or argument—such as about Soudani's own, subjective, and contemporaneous beliefs about the merits of the Paid-For Prosecution—in service of a defense that, in providing payments to Rosenwasser, Soudani lacked the requisite criminal intent. To date, Soudani has neither articulated such a defense nor indicated

**II.    Limited Testimony Regarding Soudani's History of Threats And Abuse is Admissible as Direct Evidence of the Charged Offenses And Pursuant to Rule 404(b)**

**A.  Background**

The Government seeks to offer limited testimony from Individual-1 regarding Soudani's decades-long history of abuse leading up to Individual-1's and Individual-2's fleeing from Soudani to Colorado in October 2022, immediately preceding and continuing during the charged crimes. The Government anticipates that Individual-1 would testify, in substance and in part, that she moved to New York from Jordan in 1977, at the age of 17, to live with Soudani, his first wife, and their children.  Soudani's first wife died that year and, a few months after his first wife's death, Soudani began sexually, physically, and emotionally abusing Individual-1.  Soudani also regularly threatened to "beat the shit" out of Individual-1, Individual-2, and his own children unless they complied with his directives, often making good on his threats.  The abuse and threats continued for decades, during which time Soudani socially and economically isolated Individual-1 and kept her under his control to keep her silent.  Soudani told Individual-1 that he would kill her if she told anyone about the abuse.  Finally, on October 14, 2022—on the heels of Soudani's latest abuse and threats—Individual-1 and Individual-2 finally fled from Soudani, relocating from New York to Colorado.  After she fled from Soudani and felt comparatively safe, Individual-1 reported Soudani's abuse.[8]

---

what evidence he may seek to introduce to support it.  To the extent Soudani intends to introduce any evidence about the merits of the Paid-For Prosecution in support of any such *mens rea* defense, he should be required to lay the requisite foundation, and the Government reserves the right to object pursuant to, among other things, Rule 403's bar against unfairly prejudicial, confusing, misleading, or dilatory evidence.

[8] In June 2023, Individual-1 filed a civil suit in the Supreme Court of the State of New York, Orange County, against Soudani in connection with Soudani's alleged power of attorney over

As charged in the Indictment, later that same month after Individual-1 and Individual-2 fled to Colorado, Soudani agreed to bribe Rosenwasser to investigate and prosecute Individual-1 and Individual-2 for allegedly stealing from Soudani. The Government also expects to show that, during the charged bribery scheme, Soudani issued a series of written threats directed at Individual-1 and Individual-2 and sent electronically to, among others, Individual-3, who was living in Colorado in close proximity, and in frequent communication with, Individual-1 and Individual-2.[9] In particular, as charged in the Threats Count and described above, on April 16, 2023, Soudani sent to his son an interstate text message directed at Individual-1, stating, among other things: "swear to God I wanna fucking choke you with my own hands you deserve a fucking beating like you never had before . . . . the more you fuck with me, the more I will destroy your son completely I fucking hate you. . . . Motherfucker, I swear to you I'm a going to get you and him one way, or another it's a promise."

Evidence at trial will also include Soudani's admission during his interview with the FBI that Soudani told Rosenwasser to indict Individual-1 to humble her and stop her false claims that Soudani raped her. In other words, Soudani himself connected Individual-1's understanding of his history of abuse to his bribery scheme even before he was charged with the crimes for which he will stand trial.

**B. Applicable Law**

Evidence is relevant if "it has any tendency to make a fact more or less probable than it

---

Individual-1, in which Individual-1 alleged that Soudani sexually, physically, and emotionally abused her. In November 2023, Individual-1 filed a federal civil suit against Soudani, likewise recounting Soudani's history of abuse in detail. Both civil cases were settled.

[9] Individual-1 would testify that Individual-3 was also a victim of Soudani's abuse and had left New York for Colorado at a young age to escape Soudani.

would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401.  "Relevant evidence is not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009).  Relevant evidence is generally admissible, Fed. R. Evid. 402, but may be excluded "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice," Fed. R. Evid. 403.

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2). The Second Circuit has adopted an "inclusionary approach" to Rule 404(b) evidence, under which "other-crimes evidence is admissible if offered for any purpose other than to show a defendant's criminal propensity." *United States v. Williams*, 930 F.3d 44, 62 (2d Cir. 2019) (emphasis omitted).  Evidence of prior acts is admissible under Rule 404(b) if: (1) it is offered for a proper purpose; (2) it is relevant to a disputed issue; (3) its probative value is not substantially outweighed by its potential for unfair prejudice; and (4) an appropriate limiting instruction is given if requested. *See United States v. Curley*, 639 F.3d 50, 56-57 (2d Cir. 2011).

Finally, evidence of misconduct "may be admissible as direct evidence of the crime charged and not subject to Rule 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the

12

charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Fishman*, 157 F.4th 143, 162 (2d Cir. 2025).

### C. Discussion

The Court should admit limited testimony from Individual-1 regarding Soudani's decades-long history of abuse and threats as both direct evidence of the charged offenses and, in the alternative, pursuant to Rule 404(b) to show Soudani's state of mind and motive.

*First*, this history of abuse is direct evidence of two separate elements of the Threats Count. The interstate threats statute, 18 U.S.C. § 875(c), has both subjective and objective elements. *United States v. McCain*, No. 21-2982, 2023 WL 2335332, at *5 (2d Cir. Mar. 3, 2023) (summary order). To meet the subjective element, the Government must show that Soudani transmitted an interstate communication "for the purpose of issuing a threat, or with the knowledge that the communication will be viewed as a threat." *Elonis v. United States*, 575 U.S. 723, 740 (2015). To meet the objective element, the Government must show "that the circumstances were such that an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury." *United States v. Francis*, 164 F.3d 120, 123 (2d Cir. 1999).

Here, Soudani's history of physical abuse, and of carrying out his threats, is highly probative of both elements. A jury may readily infer that, having previously threatened and carried out real physical violence against Individual-1 for many years, Soudani acted with subjective intent to threaten to injure when he sent the interstate text message directed at Individual-1 stating, among other things, "swear to God I wanna fucking choke you with my own hands you deserve a fucking beating like you never had before." *Cf. United States v. Fratus*, No. 22-1185, 2023 WL 2710270, at *2-3 (3d Cir. Mar. 30, 2023) (affirming admission of other threats under Rule 404(b) as evidence of defendant's motive and intent in Section 875(c) prosecution); *United States v. Segui*, No. 19 Cr.

13

188 (KAM), 2019 WL 8587291, at *9 (E.D.N.Y. Dec. 2, 2019) (admitting evidence of defendant's subsequent acts "because those acts allow the jury to consider inferences about [defendant's] state of mind and whether he intended his communication to convey a threat, or knew the communication would be taken as such").  Similarly, with respect to the objective inquiry, a jury may readily conclude that "an ordinary, reasonable recipient familiar with the context of the communication"—including that the sender had previously threatened and carried out physical violence against the person at whom the threat is directed—"would interpret it as a true threat of injury."  *Francis*, 164 F.3d at 123; *see Segui*, 2019 WL 8587291, at *9 n.5 (noting that "only circumstances known to the recipient are relevant to the objective inquiry").

*Second*, the history of abuse is highly probative of Soudani's state of mind and motive for engaging in all of the charged crimes.  Without an understanding of that history, the jury would be left wondering why Individual-1 and Individual-2 left for Colorado in October 2022, and what motive Soudani may have had to bribe a prosecutor to file charges against his own family members.  Similarly, the jury would be left wondering what motive Soudani may have to threaten his sister with physical harm.  Individual-1's testimony about the history of abuse would fill those evidentiary gaps, allowing the jury to infer that Soudani's motive was to retaliate against Individual-1 and Individual-2 after they finally escaped his decades-long abuse and control.  *See, e.g.*, *United States v. Williams*, 731 F. App'x 894, 899 (11th Cir. 2018) ("[E]vidence that Defendant had physically abused N.J.—leading to N.J.'s bringing of domestic abuse charges against him—further suggested that the desire for revenge could have motivated Defendant to kidnap her."); *United States v. Williston*, 862 F.3d 1023, 1036 (10th Cir. 2017) (evidence of defendant's "harsh, physical disciplining of and anger toward [the victim]" was properly admitted to show that defendant "had a motive for harming [the victim]: animosity or, as the district court

14

put it, 'resentment'"); *United States v. Johnson*, 860 F.3d 1133, 1142 (8th Cir. 2017) ("Johnson's prior crimes against D.M. help explain the history of Johnson and D.M.'s relationship, from which Johnson's intent to commit violence upon D.M. is derived."); *United States v. Howard*, 692 F.3d 697, 704 (7th Cir. 2012) ("Howard's threat to shoot Brown unless she dropped the charges against him—is powerful evidence of his intent to harm Brown and his motive to kill her."); *United States v. Fazal-Ur-RahIndividual-1-Fazal*, 355 F.3d 40, 50-51 (1st Cir. 2004) (testimony regarding the nature of defendant's marriage and threats of violence against his wife was properly admitted under Rule 404(b) to "assist[] the jury in understanding the motivating factors behind [defendant's] decision to kidnap the children"; "[f]rom this evidence, the jury easily could have inferred that [defendant] held a great deal of animus towards [his wife], that (should she take any action) he intended to punish her, and that, by kidnapping the children, he accomplished his goal"); *United States v. Frank*, 11 F. Supp. 2d 314, 319 (S.D.N.Y. 1998) (evidence of defendant's prior abuse of the victim admissible to show motive (citing cases)).

The proffered testimony should be admitted under Rule 403. As discussed, the testimony is highly probative of multiple material issues, which the Government expects to be in dispute at trial. While the Government acknowledges that testimony that Soudani perpetrated sexual, physical, and emotional abuse may be inflammatory, the Government submits that the risk of any unfair prejudice can be significantly reduced by keeping the inquiry brief, narrow, and focused on the fact of the abuse rather than any graphic details of how it was carried out.[10] So narrowed, the testimony would not be more sensational or inflammatory than the other evidence that will be

---

[10] While the Government does not seek to elicit any graphic details of Soudani's abuse during Individual-1's direct examination, Soudani may open the door to them to the extent he suggests to the jury on cross-examination that Individual-1 is lying about the abuse she had suffered.

15

presented at trial, including Soudani's violent threats to harm Individual-1.  Moreover, Soudani's own statements, admissible under Federal Rule of Evidence 801(d)(2)(A), reference Individual-1's allegations of abuse:  In his FBI interview, Soudani stated, among other things, that he told Rosenwasser to indict Individual-1 to humble her and stop her false claims that Soudani raped her. Viewed against that backdrop, the high probative value of limited testimony by Individual-1 about the history of abuse is not "substantially outweighed" by the danger of unfair prejudice.  Fed. R. Evid. 403; *see United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (affirming admission of Rule 404(b) evidence where the evidence "represented only a tiny fraction of the testimony heard by the jury, and did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged").

Finally, the Government would have no objection to an appropriate limiting instruction, should the defendant request one, instructing the jury that Soudani is not on trial for any sexual, physical, or emotional abuse in this case and that the jury may not consider any evidence of abuse as evidence that Soudani has a bad character or a propensity to commit crimes.  "[T]he law recognizes a strong presumption that juries follow limiting instructions," *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006), and there is no basis to believe that the jury would not do so here, drastically reducing any risk of unfair prejudice to Soudani.  *See, e.g.*, *United States v. Abreu*, No. 22-2676, 2023 WL 8270427, at *2 (2d Cir. Nov. 30, 2023) (summary order) ("[T]he jury was expressly instructed not to consider this evidence as propensity evidence, but only for the limited purposes . . . just described. The district court properly identified the appropriate purpose for admission and instructed the jury to consider it for that purpose alone."); *United States v. Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) (upholding admission of Rule 404(b) evidence that "was accompanied by a careful limiting instruction by the seasoned District Judge" prohibiting the jury

16

from considering the evidence for a propensity purpose); *United States v. Holmes*, 421 F. App'x 76, 79 (2d Cir. 2011) (explaining that limiting instruction that prohibited Rule 404(b) evidence from being used as evidence of bad character or criminal propensity "drastically reduced" potential for prejudice); *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) ("[T]o the extent there was any risk of unfair prejudice, the district court satisfactorily reduced that possibility with a thorough and carefully worded limiting instruction."); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (affirming admission of Rule 404(b) evidence where "the district judge gave proper limiting instructions to the jury regarding the evidence of prior narcotics transactions both during the trial and in his charge to the jury following summations").

## III.    A Partial Recording Of Rosenwasser's Planned Confrontation of Individual-1 at Her Arrest in Colorado Is Admissible

Soudani and Rosenwasser's conspiracy included a plan for Rosenwasser to personally appear at Individual-1's arrest in Colorado—an unusual step for a prosecutor, and one that the co-conspirators' planning communications indicated was designed to intimidate Individual-1. Local officers with the Parker County Police Department (the "PCPD") were also on the scene when Rosenwasser confronted Individual-1in the hallway outside of her apartment just after 7:00 a.m. on March 8, 2023. The PCPD officers' body-worn camera footage recorded this critical moment of Soudani's scheme. An excerpt of that recording—showing Rosenwasser's non-assertive conduct in confronting Individual-1, his exchanges with Individual-1 in furtherance of the conspiracy with Soudani, and the statements Individual-1 made while startled by Rosenwasser's presence and purpose—is admissible under Federal Rules of Evidence 801(d)(2)(E) (co-conspirator statements) and 803(2) (excited utterances), and the enclosed transcript should be provided to the jury as an aid when the Body Camera Recording is published. *See* Ex. A (the

17

"Body Camera Recording"); Ex. B (the "Body Camera Transcript").[11]

### A. Background

On December 23, 2022—six weeks after Soudani's first $15,000 payment to Rosenwasser, and two days before his next payment of $5,000—Rosenwasser texted Soudani about his plan to personally travel to Colorado to search and interview Individual-1 and Individual-2 as part of the Paid-For Prosecution: "I am planning on going to Colorado for the search and to interview. I think when Individual-1 sees me, it's over." Testimony and documentary evidence at trial will establish that Rosenwasser had known both Soudani and Individual-1 for decades before the initiation of the Paid-For Prosecution.

The next month, on January 20, 2023, Soudani texted Rosenwasser his approval of this plan: "[Y]ou have surpassed my expectations by far and the most genius thing you doing [*sic*] is you going to Denver personally. I would never thought of that you leaving no chance to any wholes [*sic*] or mistakes[.]"

About six weeks later, in March 2023, Rosenwasser flew to Colorado with two OCDA investigators to appear personally at Individual-1's door on the morning of the planned arrest and search of her home. Rosenwasser and his agents were accompanied by local PCPD officers, whose body-worn cameras captured video and audio recordings of Individual-1's shocked reaction when she was startled by Rosenwasser at her door on March 8, 2023.

The Body Camera Recording begins with Individual-1 standing in the hallway outside of her apartment's front door at approximately 7:00 a.m. Two PCPD officers and OCDA Investigator

---

[11] The Body Camera Recording reflects a 4-minute excerpt of a 3-hour, 21-minute recording. The Body Camera Transcript is a draft transcript of that excerpt. The Government will produce the final transcript to the defense once it is ready.

Michael Grasso stood with her while she asked questions about the necessity of the PCPD officers' visible weapons and for an explanation of why she was under arrest.

Shortly after Individual-1 asked Investigator Grasso for an explanation, her attention appeared to shift down the hallway as Rosenwasser, whom she had known for decades, appeared and approached her. The following are excerpts from the exchange that ensued:

Individual-1:   Really?  Rosenwasser?

Grasso:         Come over here.  Just come over here.

Individual-1:   Rosenwasser? Me?  Shame on you.  Shame on you.  Me?  Me?  Shame on you.  Me?

Rosenwasser:  What's up, [Individual-1]?

Individual-1:   Why are you coming after me?

Rosenwasser:  Why do you think?

Individual-1:   I don't understand why.  No, I don't.

[…]

Individual-1:   Shame on you, I'm your friend.

Rosenwasser:  Long time.  So I'm surprised I have to be here.

Individual-1:   I'm your friend.  You, I made you food.

Rosenwasser:  Tabouleh. I know. [laughing]

[…]

Individual-1:   Shame on you.  Shame on you. . . .  You wanna know why I left? I was getting beat up every single day. . . .

Rosenwasser:  [Individual-1], you need to help yourself, okay? Calm down. . . .

Individual-1:   Shame on you.  Shame on you.  Shame on you.  It's nice to know people in high places so they can do whatever they want to do to anybody. Shame on you.

19

Rosenwasser:  I'm not too high, [Individual-1].  I'm not too high.

Individual-1:  Doesn't matter.  Higher than somebody else.

## B.  Applicable Law

1.  Hearsay

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Hearsay is generally inadmissible.  Fed. R. Evid. 802.  But there are definitional exclusions and categorical exceptions to this general rule.  *See* Fed. R. Evid. 801(c), 801(d), and 803.  As a result, not all out-of-court statements are inadmissible.  For example, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note.  So a statement offered only to show its effect on the listener is not hearsay.  *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").  And evidence of non-assertive *conduct* is not evidence of any statement at all, so cannot be excluded as hearsay.  For example, the "visual images" of a video recording are not "oral or written assertion[s] or . . . nonverbal conduct of a person . . . intended by the person as an assertion," Fed. R. Evid. 801(a), "and are therefore not 'statements' subject to the hearsay rules." *United States v. Munoz-Mosquera*, 101 F.3d 683, 1996 WL 281591 (Table), at *2 (2d Cir. 1996).

20

### 2. Co-Conspirator Statements

Rule 801(d)(2)(E) is one of several ways that an opposing party's admissions are excluded from the rule against hearsay. It provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included Soudani and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

### 3. Excited Utterances

The excited utterance exception to the rule against hearsay permits the admission for its

21

truth of an out-of-court statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). "The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). "For a statement to qualify as an excited utterance, a court must find that (1) a startling event occurred; (2) the declarant made the statement while under the stress of the excitement caused by the startling event; and (3) the statement relates to the startling event." *United States v. Davis*, No. 24 Cr. 192 (WFK), 2025 WL 1201983, at *2 (E.D.N.Y. Apr. 25, 2025); *see also United States v. Delvi*, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003).

In determining whether to admit a statement as an excited utterance, courts examine the time lapse between the event and the statement, whether the event was "startling," *United States v. Jones*, 299 F.3d 103, 113 (2d Cir. 2002), or "stressful," *United States v. Fell*, 531 F.3d 197, 231 (2d Cir. 2008), as well as the declarant's demeanor, including whether the declarant was "distraught," *id.*, "agitated" or "scared," *Jones*, 299 F.3d at 113, or "nervous," *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990). But "there is no set time interval following a startling event or condition after which an utterance relating thereto will be ineligible for exception from the hearsay rule. Each case is governed by its individual circumstances." David F. Binder, Hearsay Handbook 4th § 9:5. In fact, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." *United States v. Spencer*, No. 22 Cr. 1464 (GHW), 2023 WL 5091827, at *2 (2d Cir. Aug. 9, 2023) (cleaned up); *see also, e.g.*, *Tocco*, 135 F.3d at 127-28 (approving admission of excited utterances made approximately three hours after startling event). Rather, it "must be contemporaneous with the excitement engendered by the startling event." *Delvi*, 275 F. Supp. 2d at 415 (quoting *United States v. Joy*, 192 F.3d 761, 766

22

(7th Cir. 1999)).  Moreover, "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of Rule 803(2), under the stress of excitement caused by the event or condition." *Jones*, 299 F.3d at 112 (quoting *Scarpa*, 913 F.2d at 1017).

#### 4.  Transcripts as Jury Aids

Courts may permit the Government "to publish to the jury a transcript" of a "properly admitted recording" to "serve as a jury aid." *United States v. Zemlyansky*, 908 F.3d 1, 18 (2d Cir. 2018).  That discretion extends to allowing the jury to refer to transcripts "during deliberations," if accompanied by an instruction "that the transcripts themselves are not evidence and may be used only as aids in listening to the audio tapes and as nonbinding guides that are subject to the jurors' own assessment of the transcripts' accuracy." *United States v. Rosa*, 17 F.3d 1531, 1548 (2d Cir. 1994).

### C.  Discussion

The Body Camera Recording contains evidence of Rosenwasser's non-assertive conduct (*i.e.*, his presence, as planned with Soudani, at Individual-1's arrest), Rosenwasser's exchanges with Individual-1 in furtherance of his conspiracy with Soudani, and Individual-1's excited utterances after Rosenwasser's planned confrontation at her home.  None of these is hearsay, and the Body Camera Recording should be admitted with the Body Camera Transcript provided to the jury as an aid.

*First*, to the extent the Body Camera Recording captures images of Rosenwasser's execution of his plan with Soudani to confront Individual-1 at her arrest, it is admissible as evidence of non-assertive conduct.  Rule 801 "exclude[s] from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion."  Fed. R. Evid. 801,

23

advisory committee notes.  Consistent with the rule, courts have admitted "visual images on []
videotapes" as non-hearsay evidence of conduct.  *Munoz-Mosquera*, 1996 WL 281591, at \*2; *see
also, e.g.*, *United States v. Moskowitz*, 581 F.2d 14, 21 (2d Cir. 1978) (admitting police sketches
over hearsay objection on similar grounds).

*Second*, Individual-1's statements made during Rosenwasser's shocking arrival and
confrontation are admissible as excited utterances.  "The rationale for this hearsay exception is that
the excitement of the event limits the declarant's capacity to fabricate a statement and thereby
offers some guarantee of its reliability."  *Tocco*, 135 F.3d at 127.  Indeed, Rosenwasser's surprise
confrontation was "startling," *Jones*, 299 F.3d at 113, and "stressful," *Fell*, 531 F.3d at 231,
because Rosenwasser and Soudani planned for it to be that way, with the goal that the confrontation
would accelerate the outcome both co-conspirators wanted: "I think when Individual-1 sees me,
it's over," read Rosenwasser's proposal to Soudani several months before the confrontation.  And
Individual-1's demeanor is clear on the recording: she is "distraught," *Fell*, 531 F.3d at 231,
"agitated" and "scared," *Jones*, 299 F.3d at 113.  What is more, Individual-1's statements follow
immediately from the moment she saw Rosenwasser enter her hallway.  The spontaneous nature
of Individual-1's statements counsels strongly in favor of their admission.  While the excited-
utterances exception does not require simultaneity, Individual-1's statements were clearly made
while under the "stress" produced by the "startling event or condition" to which they relate.  Fed.
R. Evid. 803(2).  *See, e.g.*, *Delvi*, 275 F. Supp. 2d at 415-16 (admitting excited utterances made 40
minutes after triggering event); *Tocco*, 135 F.3d at 127 (affirming admission of excited utterance
made three hours after event).

*Third*, Rosenwasser's statements to (and in response to) Individual-1 during this staged
confrontation—an overt act in furtherance of the conspiracy, planned in advance in

24

communications between Rosenwasser and Soudani—are co-conspirator statements admissible under Rule 801(d)(2)(E).  At the threshold, the original speaking indictment in this case provides a sufficient basis for the Court to conclude that there was a conspiracy between Soudani and Rosenwasser and that Rosenwasser's statements to (and in response to) Individual-1 when he confronted her at her arrest were made in furtherance of that conspiracy.  *See Gupta*, 747 F.3d at 123.  Rosenwasser's statements include admissions about the existence and scope of his prior relationship with Individual-1 (for example, after Individual-1 said, "I'm your friend. I made you food," Rosenwasser admitted, "Tabouleh. I know.").   Others of Rosenwasser's statements furthered the charged crimes by "hid[ing] the existence or activities" of his conspiracy with Soudani, *United States v. Delva*, No. 12 Cr. 802 (KBF), 2014 WL 4460360, at *10 (S.D.N.Y. Sept. 10, 2014), as when he falsely implied he was insufficiently powerful to direct a corrupt prosecution: when Individual-1 stated that "It's nice to know people in high places so they can do whatever they want to do to anybody," Rosenwasser replied, "I'm not too high, Individual-1.  I'm not too high."

*Fourth*, to the extent Individual-1's statements in the Body Camera Recording are not admitted as excited utterances, they are admissible to provide context for Rosenwasser's co-conspirator statements.  As just one example, Rosenwasser's remark that he was "not too high" cannot be intelligibly interpreted without the context provided by Individual-1's preceding allegation. Statements offered "for context" may be introduced "as non-hearsay statements." *United States v. Bouterse*, 765 F. App'x 463, 468 (2d Cir. 2019) (admitting non-hearsay statements to provide context to recorded statements); *United States v. Paulino*, 445 F.3d 211, 217-18 (2d Cir. 2006) (statement admitted "to aid the jury in understanding the course of events").

*Fifth*, after admitting the Body Camera Recording, the Court should permit the

25

Government to publish the Body Camera Transcript to the jury—and permit the jury to refer to the Body Camera Transcript during deliberations—with an instruction that the Body Camera Transcript is not evidence but rather an aid to the jury's understanding of the Body Camera Recording. *See Zemlyansky*, 908 F.3d at 18 (affirming similar rulings).

*Finally*, for the reasons discussed above in Section II.C, the significant probative value of Individual-1's statements is not outweighed by the danger of unfair prejudice. The Body Camera Recording is an excerpt of a longer recording that includes many additional statements from Individual-1 about Soudani's abuse and its relationship to what Individual-1 immediately perceived as Rosenwasser and Soudani's joint effort to punish her. Excising those additional statements serves Rule 403's purpose of keeping the probative value of evidence in balance with its potential for unfair prejudice. And as discussed above, a limited presentation of this evidence is no more sensational or inflammatory than Soudani's own admissible statements, some of which are the legally consequential verbal acts that gave rise to the Threats Counts. The Body Camera Recording's excerpting—as supplemented by any limiting instruction should Soudani request one—strikes the balance required by Rule 403.

26

**IV.    Rosenwasser's Communications with Individual-1's Counsel are Admissible as Co-Conspirator Statements And to Show the Effect on The Listener**

The Court should permit the Government to introduce—through witness testimony and documentary evidence, such as emails and letters—statements made by Individual-1's counsel in the Paid-For Prosecution (*i.e.*, Individual-1's Counsel) to Rosenwasser and Rosenwasser's responses.   Individual-1's Counsel's statements are admissible for the non-hearsay purpose of showing their effect on Rosenwasser, who responded to the statements by dissembling and lying to Individual-1's Counsel and senior officials at OCDA about the scope of his relationship with Soudani and Individual-1 to conceal and maintain his conspiracy with Soudani.

**A.    Background**

1.    Rosenwasser's Communications with Individual-1's Counsel in Furtherance of Soudani's Conspiracy

On March 16, 2023, after Rosenwasser had traveled to Colorado, Rosenwasser emailed Individual-1's Counsel, attaching the felony complaints against Individual-1 and Individual-2 and indicating that Rosenwasser planned to "present the case to the grand jury by the end of the week." On March 20, 2023, Individual-1's Counsel advised Rosenwasser that Individual-1 was a victim of years-long abuse by Soudani that raised questions about Soudani's credibility, particularly as a grand jury witness.  In response, Rosenwasser indicated, including by email, that that he saw "little purpose" in proceeding with a proffer of Individual-1 regarding Soudani's abuse if the "sole purpose of the proffer is to present 'cross-complaints' against [Soudani], and that the "timing of [Individual-1's] [outcry] gives me pause."

During the course of the Paid-For Prosecution, Individual-1's Counsel repeatedly informed Rosenwasser, in person, by phone, by email, and by letter, that Rosenwasser should recuse himself from the case because Rosenwasser had previously represented Soudani and Individual-1 in a civil

27

case and for certain real estate transactions.

On April 5, 2023, Individual-1's Counsel sent Rosenwasser a letter stating, in part, "With deference to your long and distinguished record of public service, your relationship to this family creates at least the appearance of a conflict.  The positions you are taking in this case [are] unusual."  On April 6, Rosenwasser emailed Individual-1's Counsel, in part, "Finally, as I indicated to you during our first phone conversation, I do not recall a single instance that I served as Moutz Soudani's personal attorney and would not even describe my relationship with the Soudani family as social."

On April 10, 2023, Individual-1's Counsel emailed Rosenwasser the following, in part:

> With respect to your representation of Mr. Soudani, we have attached a screen shot from the unified court system records that show that you represented the complainant in a civil matter. We understand that you may have also represented Mr. Soudani and his son on a burglary charge in the same period.

Later that day, Rosenwasser emailed Individual-1's Counsel, in part, "I guess I didn't remember that case with Mr. Soudani 32 years ago.  In any event, if this is going to be an issue, I would like to deal with it now."[12]

On April 17, 2023, at approximately 2:38 p.m., and after speaking with Rosenwasser by phone, Individual-1's Counsel sent a letter to Rosenwasser stating, in part:

> With respect to recusal: we agree that recusal should be dealt with sooner than later. Our position is that your representation of the People here presents at least the appearance of impropriety. Accordingly, you should recuse yourself from the matter and the Office should wall you off from its continuance.

---

[12] On April 13, 2023, Rosenwasser called Soudani, with the call lasting for approximately six minutes and 41 seconds.  On April 14, 2023, Rosenwasser called Soudani, with the call lasting approximately 14 seconds (the call likely went to voicemail), and Soudani called Rosenwasser back, with the call lasting approximately three minutes and 29 seconds. That same day, Soudani signed a check made out to Rosenwasser in the amount of $5,000, with "Loan" in the memo line, which Rosenwasser deposited.

> You first advised that you had never represented Mr. Soudani. When presented with evidence that you had in fact represented Mr. Soudani, you stated in subtance that you did not remember a case from "32 years ago"
>
> . . .
>
> Our limited research to date now shows us that you unquestionably handled at least ten separate real estate transactions involving the Soudani family during the period from October 1990 until November 1991, including the filing of some 19 different documents. To be clear, it appears that you represented both Moutz Soudani and our client [*i.e.*, Individual-1] for purposes of these transactions. The relevant records are attached. Even if you do not remember your work on these matters, there can be no question that Moutz Soudani would have remembered it. And, as we have advised you, [Individual-1] remembers and is very uncomfortable with you in the case.
>
> To be clear, although you denied having one, we have not alleged that you had a "social" relationship with the Soudanis. We are, however, informed that you visited 40 Bailey Road [Soudani's prior residence] during the period that you served as a judge. And, as mentioned previously, it is our understanding that you may have represented both Mr. Soudani and his son on a criminal matter involving an alleged burglary.[13]

On April 18, 2023, at 10:44 a.m., Rosenwasser emailed Individual-1's Counsel the following, in part:

> I acknowledge receipt of your letter of April 17, 2023, and attached list of real estate matters from 1990 and 1992.  I will not take the liberty of responding to your concerns but will rather distribute the letter and enclosure to the District Attorney and members of the executive staff for their review and consideration.  I will, of course provide any information requested of me in reaching a decision on your request for my recusal.[14]

---

[13] Approximately two hours later, at 4:44 p.m., Rosenwasser called Soudani, with a call lasting for over four minutes.

[14] At 12:44 p.m., Soudani called Rosenwasser, and the call lasted 30 seconds.

On April 25, 2023, in response to an email from Individual-1's Counsel about the "assigned ADA," Rosenwasser emailed Individual-1's Counsel: "I anticipate a resolution this week on your recusal request."

The conflicts of interest raised by Individual-1's Counsel did not include the fact that by this point in April 2023, Rosenwasser had already taken more than $30,000 in payments from Soudani. That matter was not raised by Individual-1's Counsel in this 2023 correspondence because it remained obscured by Soudani and Rosenwasser's acts of concealment, including the lies summarized below.

2.  Rosenwasser's Lies to OCDA to Conceal and Maintain the Conspiracy

On April 18, 2023, Rosenwasser emailed the District Attorney and several other OCDA employees with the subject line: "People v [Individual-1] Recusal Request." Rosenwasser's email attached Individual-1's Counsel's April 17 letter and stated the following:

> This is the companion case to the Grand Larceny 1 involving cryptocurrency charged against this defendant's son. From the beginning the lawyer has been maneuvering to make a recusal request and I even encouraged him to do so. As you can see from the attachments, he has invested time and money to search for a basis to conflict me off the case. I think there is also a case from 1988. I have no recollection of any of these matters.
>
> I felt it best if we reviewed this together so a response can be crafted. I am available as your schedules permit.

At trial, the Government expects to show, through the testimony of OCDA witnesses, that Rosenwasser told OCDA officials that he did not recall the prior representations that Individual-1's Counsel had referenced, and that the real estate transactions at issue were likely handled by a secretary or member of his support staff when he was in private practice. Rosenwasser did not disclose to OCDA officials that he had a personal relationship with Soudani and Individual-1, that he was regularly communicating and meeting with Soudani, or that he was accepting payments

30

from Soudani during the course of the Paid-For Prosecution.[15]

## B. Discussion

Individual-1's Counsel's statements to Rosenwasser about the domestic abuse and conflicts issues should be admitted for the non-hearsay purpose of showing their effect on Rosenwasser. Upon learning of Individual-1's Counsel's claims that Soudani had previously abused Individual-1 and had potential credibility issues, Rosenwasser swiftly disregarded the claims without any investigation and proceeded with the Paid-For Prosecution, evidencing his determination to protect his corrupt agreement with Soudani from disruption.  Indeed, agreeing to meet with Individual-1 would have risked jeopardizing Rosenwasser's star witness (Soudani), undermining the prosecution, and potentially unraveling the bribery scheme.  Then, upon being confronted with Individual-1's Counsel's claims that Rosenwasser had a conflict of interest in the case, Rosenwasser fraudulently concealed his personal relationship with Soudani—including his ongoing extensive communications with, and receipt of payments from, Soudani—from both Individual-1's Counsel and OCDA officials, evidencing Rosenwasser's consciousness of guilt and determination to maintain control of the Paid-For Prosecution and thus further and conceal the bribery scheme.[16]

Rosenwasser's statements to Individual-1's Counsel and to OCDA officials are plainly admissible as co-conspirator statements under Rule 801(d)(2)(E) because they were made during

---

[15] The Government expects the evidence at trial to establish that the Paid-For Prosecution was nonetheless reassigned to another senior prosecutor so that Individual-1's Counsel would not continue to press this issue.

[16] Rosenwasser's communications with Individual-1's Counsel would also provide necessary context to explain to the jury why Soudani and Rosenwasser were in contact during the period of these communications.

and in furtherance of the charged conspiracy. *See United States v. Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."). The Court should admit Individual-1's Counsel's statements to Rosenwasser for the non-hearsay purpose of showing their effect on the listener (Rosenwasser) and providing the jury with necessary context for Rosenwasser's actions and statements in response, as reflected in Rosenwasser's electronic communications and statements to OCDA officials, some of whom are expected to testify at trial. *See, e.g.*, *Bouterse*, 765 F. App'x at 468 (affirming admission of non-testifying witnesses' out-of-court statements "to place [defendant's] recorded statements in context," and explaining that "statements not offered for their truth, but instead, for their effect on the listener or for context, may be introduced as non-hearsay statements" (citing cases)).

Finally, Rule 403 poses no barrier to the admission of Rosenwasser's communications with Individual-1's Counsel. The evidence has strong probative value: it sets the stage for a pivotal moment in Soudani's scheme, when OCDA (through Individual-1's Counsel's correspondence) is first made aware of a potential conflict of interest for Rosenwasser (albeit one much less significant than the bribes that Soudani and Rosenwasser had still kept concealed), and Rosenwasser takes several steps to advance the scheme. This "significant probative value" puts a heavy thumb on the scale for admission. *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998). And there is little Rule 403 danger to weigh it against: the brief correspondence is straightforward, and its accusations that Rosenwasser should have recused himself on the basis of older and less significant conflicts of interest "do not involve conduct any more sensational or disturbing" than the Bribery Counts. *Roldan-Zapata*, 916 F.2d at 804. Individual-1's Counsel's references in these communications to Soudani's abuse of Individual-1 are stated in a sober fashion in correspondence

32

between lawyers. Moreover, Soudani himself referenced Individual-1's allegations of abuse in his interview with the FBI. For the reasons stated above, these contextual references to Soudani's abuse of Individual-1 do not pose any danger of unfair prejudice that cannot be cured with a limiting instruction.

In sum, Individual-1's Counsel's communications to Rosenwasser should be admitted for their effect on Rosenwasser and as necessary context for admissible evidence about Rosenwasser's lies to OCDA to head off their discovery of the bribes Soudani was paying him for the Paid-For Prosecution.

## V.    Evidence of Prior Bribery Schemes Is Admissible Pursuant to Rule 404(b)

The Court should admit pursuant to Federal Rule of Evidence 404(b): (i) the testimony of Witness-1 that Soudani told Witness-1, in or before October 2022, that Rosenwasser had taken bribes when he was a judge from litigants from the area's Hasidic community in exchange for bench-trial acquittals or other favorable outcomes; (ii) the testimony of Individual-1 that, in approximately the late 1990s, Rosenwasser received cash bribes from the Hasidic community while seeking to be elected or serving as a state court judge and then worked with Soudani to launder the proceeds of those cash bribes; and (iii) the testimony of a witness ("Witness-2") who paid then-Judge Rosenwasser a bribe of $100,000 for acquitting Witness-2 of Driving While Intoxicated ("DWI") charges at a bench trial in 2003.

### A. Background

1. <u>Anticipated Testimony of Witness-1</u>

Witness-1 is expected to testify as follows, in substance and in part: Witness-1 first met Soudani and Individual-1 in approximately 2016 and became friends with both of them. Witness-1 socialized at the Soudani Home and attended the wedding of one of Soudani's grandchildren

shortly before the initiation of the Paid-For Prosecution.  During the course of her friendship with Soudani, Witness-1 socialized with Soudani by, among other things, walking the track at a nearby school and enjoying meals together.  Because Soudani and Witness-1 were both interested in civic matters, they often talked about local politics and public affairs.  In more than one of these discussions, in or before October 2022, Soudani told Witness-1 that Rosenwasser had taken bribes when he was a judge from litigants from the area's Hasidic community in exchange for bench-trial acquittals or other favorable outcomes.  In October 2022, Soudani told Witness-1 that Individual-1 and Individual-2 had taken money from Soudani, and that Rosenwasser owed him an unpaid debt of approximately $40,000 and would "take care of" Soudani's situation for him.[17]

### 2.  Anticipated Testimony of Individual-1

As previewed in the Factual Background, *supra*, Individual-1 is expected to testify about the decades-long relationship between Soudani and Rosenwasser, including while Rosenwasser was a state court judge.  As part of explaining that relationship, Individual-1 would testify about her personal knowledge that Soudani helped Rosenwasser launder cash bribes.  Individual-1 is expected to testify as follows, in substance and in part:  In approximately the late 1990s, Individual-1 was living with Soudani and his late wife (the "Late Wife").  At the time, Rosenwasser and Soudani were friends, and Rosenwasser frequented Soudani's restaurant and socialized with

---

[17] Soudani's statements are not hearsay because they are the statements of a party opponent.  *See* Fed. R. Evid. 801(d)(2)(A).  In contrast, Soudani may not offer his (or his co-conspirator, Rosenwasser's) statements for their truth, because Rule 801(d)(2)'s hearsay exclusions apply only when the statement is "offered against an opposing party."  *See, e.g.*, *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *see also, e.g.*, *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1987) ("[D]efense counsel wished to place [the defendant's] statement before the jury without subjecting [the defendant] to cross-examination, precisely what the hearsay rule forbids.").

Soudani at Individual-1 and Soudani's shared home (*i.e.*, the Soudani Home).   On several occasions over the period of approximately one or two months, Individual-1 observed Rosenwasser stop by her and Soudani's house with manila envelopes filled with cash, and the envelopes had on them handwritten numerical values like "15,000" or "35,000."   After Rosenwasser brought the manila envelopes in the house, the Late Wife would count the money inside, write a check with "loan" on it for that amount, and give the check to Soudani to give to Rosenwasser.   Soudani told Individual-1 on a number of these occasions that the "Hasidic community" gave Rosenwasser the cash, either to help Rosenwasser get elected as a state court judge, or for him to do favors for the Hasidic community once he was elected.   Soudani also told Individual-1 to place Rosenwasser's cash in a safe in Individual-1's room and to write down the amounts on a log kept inside the safe.

Typically, Rosenwasser would drop off an envelope with cash and leave with a check on the same visit, but if the Late Wife was not home, Soudani would tell Rosenwasser to come back another time, as Soudani did not write checks at that time.   On one occasion when Rosenwasser was at Individual-1 and Soudani's shared home, Individual-1 overheard Rosenwasser laugh and tell Soudani, in sum and substance, "You know I cannot put that cash in, you know that." Individual-1 is expected to testify that in total, the amount of cash that Rosenwasser brought to Soudani to exchange for "loan" checks over this period was approximately $150,000.[18]

---

[18] In late 2022, soon after she fled from Soudani and before Rosenwasser's March 2023 search of her home, Individual-1 memorialized the bribery scheme in a notebook that she kept (the "Diary"). Individual-1 wrote, among other things: "that was in [] 90s.  Marty laundered money for a Judge Stewart Rossenwasser [*sic*].  he got paid off in the elections from Hasidics Jews in cash and gave Marty the cash and Marty in return gave him a check to deposit in Stewart account as a loan so no one knows it. was about $150,000 give or take and now Rossenwasser [*sic*] is his best friend in the DA's office that Marty has a lot of things on him for black mail."  This notebook was in Individual-

Individual-1 is also expected to testify that on other occasions, Rosenwasser came to the Soudani Home without cash to ask Soudani for money, and that on these occasions, the Late Wife, with Soudani's approval, would write checks marked "loan" for Rosenwasser. Rosenwasser later delivered to Individual-1 white envelopes with cash to provide to Soudani.

3.   Anticipated Testimony of Witness-2

Witness-2 is expected to testify to the following, in substance and in part: Witness-2 ran a mortgage business in Orange County and believed his company could be implicated in an investigation of certain real estate brokers. Witness-2 asked his friend, the chief of police of the Village of Montgomery (the "Police Chief"), for advice about how to proceed. The Police Chief introduced Witness-2 to Rosenwasser, who at the time was a lawyer in private practice.[19] Witness-2 then met with Rosenwasser for a consultation, but did not retain Rosenwasser as his counsel. Approximately one year later, Rosenwasser called Witness-2 to ask for a loan. Witness-2 loaned Rosenwasser $10,000 at first, followed by an additional $15,000 approximately one week later.

In approximately 2002, Witness-2 was arrested for DWI and vehicular assault in Orange County. By this time, then-Judge Rosenwasser was one of three judges on the Orange County Court. Witness-2 conferred with the Police Chief about his felony charges, and the Police Chief

---

1's apartment in Colorado at the time of the March 2023 search. Notably, Individual-1 wrote the Diary before knowing that Soudani paid Rosenwasser in connection with the Paid-For Prosecution and long before the allegations in the instant case, including that Soudani paid Rosenwasser and disguised the payments as "loans," had been made public. The Government expects to admit the relevant portion of the Diary as Individual-1's prior consistent statement pursuant to rebut any argument by Soudani that she "recently fabricated" her testimony about the bribery scheme "or acted from a recent improper influence or motive in so testifying," or "to rehabilitate [her] credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B).

[19] In an interview with the Government, Witness-2 recalled that he was introduced to Rosenwasser in approximately the fall of 2000. Rosenwasser became a judge on the Orange County Court in January 2000 and served in that capacity until his resignation in March 2006.

told Witness-2 that then-Judge Rosenwasser could acquit Witness-2 if the case were assigned to him—but not "for free."  When Witness-2's case was assigned to then-Judge Rosenwasser, the Police Chief told Witness-2 to request a bench trial.  The Police Chief told Witness-2 that he would need to pay Rosenwasser $100,000 in cash before the start of the trial.  Witness-2 gave the cash to the Police Chief in three installments, which Witness-2 understood would be delivered to Rosenwasser.  After a several-day bench trial, then-Judge Rosenwasser acquitted Witness-2 of all charges.[20]

Witness-2 is expected to further testify that after the bench trial acquittal, Witness-2 sought to hire Rosenwasser—who was once again in private practice—for legal work connected to acquiring a Holiday Inn Hotel in Fishkill, New York.[21]  During a meeting regarding the acquisition, Rosenwasser acknowledged to Witness-2 that he had received the cash from the Police Chief in connection with acquitting Witness-2 in the earlier bench trial.  At this meeting, Rosenwasser asked Witness-2 for a $5,000 retainer in connection with the potential hotel-acquisition engagement.  Witness-2 told Rosenwasser that he would not pay him additional money, and that Witness-2 was angry because he had previously given Rosenwasser $100,000.  In response, Rosenwasser told Witness-2 that he had not received the full amount of Witness-2's bribe, because the Police Chief had taken a cut.[22]

---

[20] The Government has obtained New York State court records documenting that then-Judge Rosenwasser acquitted Witness-2 of all charges after a bench trial in 2003.

[21] In an interview with the Government, Witness-2 recalled that his attempted retention of Rosenwasser as a private-practice lawyer was in approximately 2003.  As noted above, Rosenwasser served as a New York State judge from 2000 to 2006.

[22] Witness-2 disclosed his bribery payment to Rosenwasser in an interview with law enforcement in March 2011, as documented in a contemporaneous law enforcement report.

### B.  Applicable Law

The general legal principles governing admission of Rule 404(b) evidence are set forth in Section II.B, *supra*.  "Evidence of prior bad acts is admissible to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."  *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020); *see also, e.g.*, *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (although evidence of defendant's previous plans with a co-conspirator to import narcotics "did not concern the charged conspiracy, it was relevant background evidence" because, among other reasons, "it corroborated the charge that [the co-conspirator] and [the defendant] were partners during the charged conspiracy"); *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (affirming admission of other-acts evidence to show how "illegal relationship" between co-conspirators evolved).  Prior-act evidence is also "admissible to corroborate crucial prosecution testimony" where "the corroboration is direct and the matter corroborated is significant."  *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987); *see also United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978).

In addition, the Supreme Court has recognized that other-acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  *Huddleston v. United States*, 485 U.S. 681, 685 (1988).  Evidence of another act that is "sufficiently similar to the conduct at issue" may be admitted at trial "to show that a defendant who claims that his conduct had an innocent explanation had the knowledge or intent necessary to commit the charged offense."  *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993); *see also*

*United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (affirming admission of prior acts where defendant argued that his conduct "might be nothing more than innocent acts" rather than "knowing participation" in criminal conduct); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

To take "intent out of a case, a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed." *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992); *see also, e.g.*, *United States v. McCallum*, 584 F.3d 471, 475-76 (2d Cir. 2009) ("Because [the defendant's] counsel did not make a statement to the court of sufficient clarity to indicate that intent and knowledge would not be disputed, those issues remained sufficiently in dispute for the similar acts evidence to be relevant and hence admissible."); *United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989) ("If a defendant does not wish to enter into a formal stipulation, he or she must at least 'express a decision' to restrict the defense case so as not to raise the issue of intent, and to accept a jury instruction that would keep that issue out of the case."). "[W]here it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief[.]" *Pitre*, 960 F.2d at 1120.

With respect to Rule 403 balancing, the probative value of other-act evidence "is not substantially outweighed by the risk of prejudice if the conduct is not any more sensational or disturbing than the charged crime." *Rosemond*, 958 F.3d at 125; *see also United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

### C. Discussion

1. <u>The Testimony of Witness-1 and Individual-1  Is Admissible for Proper Purposes and Relevant to Disputed Issues</u>

Witness-1's testimony that, before the Paid-For Prosecution, Soudani told Witness-1 that Rosenwasser had previously accepted bribes, and Individual-1's testimony that Rosenwasser had previously accepted bribes and Soudani knowingly provided assistance to Rosenwasser in connection with the previous bribery scheme should be admitted for at least two proper, non-propensity purposes under the Second Circuit's inclusionary approach to Rule 404(b) evidence.

*First*, the evidence "is admissible to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Rosemond*, 958 F.3d at 125; *see, e.g.*, *Roldan-Zapata*, 916 F.2d at 804 (affirming admission of evidence of a pre-existing drug-trafficking relationship between the defendant and a co-conspirator to aid the jury's understanding of how the transaction for which the defendant was charged came about and his role in it). The Government expects that at trial, Soudani will attempt to leverage aspects of his decades-long relationship with Rosenwasser to suggest to the jury that his payments to Rosenwasser, underlying the charged bribery scheme, were merely loans to an old friend, made without any criminal intent. (*See, e.g.*, Nov. 1, 2024 Tr. 29:23-30:2 (defense arguing that "we believe there are very strong defenses, the government is saying it was a bribe. We're saying it was a loan to an individual who he knew for a long time, who was cash-strapped, and who he had made loans to in the past.")); *see also* Lana Bellamy, *Mout'z Soudani Released on Bond In Bribery Case Involving Dead Prosecutor*, Albany Times-Union, Sept. 28, 2024, https://www.timesunion.com/hudsonvalley/news/article/moutz-soudani-bond-federal-bribery-case-19795488.php (quoting Soudani's then-counsel: "He did not bribe Stewart

40

Rosenwasser. He's known former Judge Rosenwasser for over 40 years and had lent him money in the past. The payments identified in the indictment were loans, not bribes.").

The Government should be permitted to rebut this defense by providing the jury with a complete picture of Soudani's relationship with Rosenwasser, including showing that Soudani knew that Rosenwasser accepted bribes and helped him in connection with a previous bribery scheme by accepting cash proceeds and, in return, providing Rosenwasser with checks marked "loan"—similar to the checks that Soudani provided to Rosenwasser as part of the charged scheme. This evidence would rebut Soudani's anticipated defense, help the jury understand the true nature of the relationship between Soudani and Rosenwasser, and explain to the jury why Soudani felt comfortable offering, and Rosenwasser accepting, bribes to prosecute Individual-1 and Individual-2. *See, e.g.*, *Rosemond*, 958 F.3d at 126 (evidence of prior bad acts properly admitted where the acts, among other things, "explained the mutual trust between [defendant] and the other conspirators, illustrating why [defendant] was comfortable involving these individuals in a crime where a conviction could result in life imprisonment or, worse, death"); *Dupree*, 870 F.3d at 76 ("The district court can . . . admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."); *United States v. Basciano*, 465 F. App'x 9, 14 (2d Cir. 2012) ("Admission of 404(b) evidence is entirely appropriate to explain, as it did here, the development of criminal relationships and to illustrate that mutual trust existed between coconspirators."); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *United States v. Pascarella*, 84 F.3d 61, 72-73 (2d Cir. 1996); *Roldan-Zapata*, 916 F.2d at 804.

*Second*, and relatedly, the evidence is admissible to prove Soudani's criminal intent, which

41

the Government also expects to be vigorously in dispute at trial.  As discussed, the Government expects that Soudani will argue that, in providing money to Rosenwasser, he was advancing personal loans without any intent to influence Rosenwasser in connection with the prosecution of Individual-1 and Individual-2.  Evidence that Soudani knew that Rosenwasser had previously accepted similar bribes and previously assisted Rosenwasser in connection with a similar bribery scheme is admissible to rebut this anticipated defense and show that Soudani acted with the requisite criminal intent.  *See United States v. Gata-Aura*, No. 22-283, 2024 WL 389422, at *2 (2d Cir. Feb. 2, 2024) (summary order) (defendant's "knowledge and concealment of [a previous] fraud provided a reasonable basis for the jury to infer that [defendant] knew of and intended to participate in the [charged fraud scheme]"); *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("[The defendant] contended at trial that he neither knew about nor intended to facilitate any securities or wire fraud by producing false audit reports. [Defendant]'s own defense strategy therefore made evidence of his previous participation in a substantially similar scheme highly probative."); *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) ("[E]vidence of appellants' involvement with previous credit card schemes was therefore probative of their intent in possessing the "access devices" for which they were charged."); *see also United States v. Willis*, 844 F.3d 155, 169-170 (3d Cir. 2016) (evidence of defendant's previous acceptance of kickback admissible under Rule 404(b) to demonstrate his intent to accept bribes); *United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012) ("The evidence that [defendant] had received three previous cash bribes . . . tended to rebut an inference that [defendant] had thought the money [the bribe-payor] paid him was a gift rather than a bribe.").

    2.  <u>Witness-2's Testimony Is Admissible for Proper Purposes and Is Relevant to Disputed Issues</u>

Witness-2's testimony about previously paying a bribe to Rosenwasser to secure an

acquittal is also admissible for proper, non-propensity purposes.

*First*, Witness-2's testimony is admissible to prove Rosenwasser's criminal intent as Soudani's co-conspirator. "[B]ecause conspiracy requires a meeting of conspirators' minds on a common criminal objective, other-act evidence indicating a co-conspirator's state of mind may well be relevant to explain how a criminal enterprise developed, to help the jury understand the basis for the co-conspirators' relationship of mutual trust or to complete the story of the charged conspiracy." *United States v. Mustafa*, 753 F. App'x 22, 36-37 (2d Cir. 2018). That Rosenwasser previously accepted a bribe in the past in exchange for an official act in a criminal prosecution makes it more probable that he agreed to accept bribes from Soudani in exchange for a similar official act. *See id.* at 37 ("[T]he fact that . . . [defendant's co-conspirator] possessed material supportive of terrorists and terrorist acts made more probable that the object of their training agreement was to provide material support for terrorism and for al Qaeda.").

*Second*, to the extent Individual-1 is permitted to testify about Soudani's assistance to Rosenwasser in connection with the bribery scheme in the late 1990s, Witness-2's testimony is admissible to corroborate Individual-1's testimony. The Government expects that Individual-1's credibility will be sharply attacked at trial, and that Soudani will argue to the jury that Individual-1 is a liar with a motive to fabricate her testimony to inculpate Soudani. Testimony of Witness-2, an independent witness, that he in fact paid a bribe to Rosenwasser to acquit him in a criminal case over which Rosenwasser presided as a state court judge is powerful evidence directly corroborating Individual-1's testimony that, around the same time period (when Witness-2 bribed Rosenwasser), Rosenwasser accepted bribes as a state court judge and candidate. *See, e.g.*, *Everett*, 825 F.2d at 660-61 (affirming admission of the testimony of a bank teller and surveillance photos to corroborate the testimony of a cooperating witness regarding the defendant's involvement in an

43

uncharged bank robbery); *see also, e.g.*, *United States v. Torres*, No. 21-2665, 2023 WL 378942, at \*4 (2d Cir. Jan. 25, 2023) (affirming admission of prior assault evidence under Rule 404(b) as "direct and significant evidence corroborating" victim's testimony that defendant had made statements to her about his abuse of a prior victim); *United States v. Porter*, 881 F.2d 878, 886 & n.8 (10th Cir. 1989) (holding that evidence of other acts was properly admitted to corroborate testimony of prosecution witness whose credibility had been attacked).

3.   The Proposed Evidence Is Admissible Under Rule 403

Witness-1's, Individual-1's, and Witness-2's testimony is admissible under Rule 403.  As discussed, each witness's testimony is highly probative evidence explaining, among other things, how the criminal relationship between Soudani and Rosenwasser developed and showing Soudani's and Rosenwasser's criminal *mens rea*.  The high probative value of this evidence is not substantially outweighed by the risk of unfair prejudice because the prior bribery schemes were of the same ilk, and certainly no more inflammatory, than the charged crimes.  *See Rosemond*, 958 F.3d at 125 ("The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not any more sensational or disturbing than the charged crime."); *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019) (probative value of Rule 404(b) evidence was not substantially outweighed by risk of unfair prejudice as it "did not involve conduct any more sensational or disturbing than the crimes with which [defendant was] charged"); *see also United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *Williams*, 205 F.3d at 34; *Roldan-Zapata*, 916 F.2d at 804.

The significant probative value of Rosenwasser's prior bribetaking (and Soudani's knowledge of it) in the late 1990s through the 2000s makes this evidence admissible notwithstanding the time gap between these similar acts and the charged crimes.  While the

44

proximity of other-acts evidence is relevant to its admissibility, especially probative evidence may be admissible even after the long passage of time. That is particularly true where, as in this case, "a showing of knowledge and intent [are] essential in order for the government to meet its burden of proof." *United States v. Martino*, 759 F.2d 998, 1005 (2d Cir. 1985). Under that circumstance, courts may admit probative evidence of older prior acts "despite the[ir] vintage." *Id.* (affirming admission of 11-year-old conviction); *see also, e.g.*, *United States v. Terry*, 702 F.2d 299, 316 (2d Cir.) (20-year-old drug conviction).

The Government would have no objection to an appropriate limiting instruction, should the defendant request one, instructing the jury that Soudani is not on trial for any previous bribery schemes, and that the jury may not consider any evidence of prior bribery schemes as evidence that either Soudani or Rosenwasser has a bad character or a propensity to commit crimes. Such an instruction would further mitigate, if not eliminate, any risk of unfair prejudice to Soudani. *See, e.g.*, *Pitre*, 960 F.2d at 1120.

## VI.    In the Alternative, Witness-1's Testimony that Soudani Told Witness-1 About Rosenwasser's Past Bribetaking Is Admissible To Show Soudani's State of Mind

In the alternative, Soudani's statement to Witness-1 about Rosenwasser's past bribetaking should be admitted not for its truth but to show Soudani's state of mind. Soudani's belief, before he began paying Rosenwasser for the Paid-For Prosecution, that Rosenwasser had previously accepted bribes in exchange for official acts makes it "more . . . probable" that Soudani made the payments to Rosenwasser with an intent to bribe him, Fed. R. Evid. 401, regardless of the truth or falsity of that belief. The evidence's probative value is only enhanced by its tendency "to rebut [Soudani's] defense," *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993), that his payments to Rosenwasser were innocent loans made without an intent to influence Rosenwasser's acts as a prosecutor. The probative value of this evidence is not substantially outweighed by any

45

risk of unfair prejudice, Fed. R. Evid. 403, particularly because Soudani's admission does not reveal conduct any more sensational or disturbing than the charged crimes. *See, e.g.*, *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019). To the extent the Court admits Soudani's statement only for this purpose, the Government would have no objection to a limiting instruction that the jury may not consider the statement for its truth—that is, that Rosenwasser in fact previously accepted bribes.

## VII.    Evidence of Rosenwasser's Lies to the FBI is Admissible

### A.  Background

On June 18, 2024, federal agents executed search warrants at Soudani's and Rosenwasser's homes. Both Soudani and Rosenwasser gave voluntary interviews to FBI agents the same day. Rosenwasser's statements to the FBI included lies about core features of his and Soudani's conspiracy.

*First*, Rosenwasser initially told the FBI that he did not have a relationship with Soudani. Rosenwasser later conceded during the same interview that he had known Soudani for 30 years, had borrowed money from him in the past, and had taken what he described as "loans" from Soudani from 2022 through 2024. As described above, the Government expects to offer extensive evidence at trial about Soudani and Rosenwasser's decades-long relationship before the Paid-For Prosecution.

*Second*, Rosenwasser told the FBI that District Attorney Hoovler, and his chief deputy Christopher Borek, were aware that Rosenwasser knew Individual-1 and that both OCDA officials endorsed Rosenwasser's plan to confront Individual-1 at the search of her Colorado home. In fact, if called at trial, Borek is expected to testify that he was unaware of any relationship between Rosenwasser and Individual-1 until more than a month after Rosenwasser's planned confrontation

46

of Individual-1 at her home in Colorado—and so he could not have endorsed Rosenwasser's strategy. When Rosenwasser later told Borek that Individual-1's Counsel had cited Rosenwasser's prior representations of Soudani and Individual-1 in the 1990s as cause for Rosenwasser's recusal, Rosenwasser failed to disclose any additional facts about his extensive relationships with Soudani and Individual-1.

### B. Discussion

Rosenwasser's false statements to the FBI are admissible. As false statements, they are not offered for their truth—and so are not hearsay. *See* Fed. R. Evid. 801(c)(2) (limiting rule against hearsay to statements offered "to prove the truth of the matter asserted in the statement"); *see also, e.g.*, *United States v. Neumann*, No. 21 Cr. 439 (NSR), 2023 WL 8700974, at *6 (S.D.N.Y. Dec. 14, 2023) (admitting a lie "offered for its falsity, rather than its truth"). Rosenwasser's "lie[s] to law enforcement officials" are probative of his "consciousness of guilt" and are admissible evidence of culpable intent and state of mind. *See, e.g.*, *United States v. George*, 779 F.3d 113, 121-22 (2d Cir. 2015). For the same reason, there is no Sixth Amendment barrier to admitting Rosenwasser's lies into evidence. "The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004); *see also, e.g.*, *United States v. Stewart*, 433 F.3d 273, 292 (2d Cir. 2006) (noting that it would take "temerity to argue that somehow *Crawford* precludes the government's proof of the Defendants' false portions of their statements because they were provided in a testimonial setting").

**CONCLUSION**

For the reasons set forth above, the Court should grant the Government's motions *in limine*.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: /s/
　　Jared D. Hoffman
　　Justin Horton
　　Olga I. Zverovich
　　Assistant United States Attorneys

Dated:　March 13, 2026
　　　　White Plains, New York

48